387 S.E.2d 537

**In the Matter of JONATHAN P.**

No. 19229.

Supreme Court of Appeals of
West Virginia

Nov. 30, 1989.

Dana R. Shay, Fairmont, for Mother.

Susan K. McLaughlin, Roger Williams, Fairmont, for infant.

J. Montgomery Brown, Pros. Atty., Rucco Fucillo, Asst. Pros. Atty., Fairmont, for State.

MILLER, Justice:

This is an appeal by Marilyn P. from an order of the Circuit Court of Marion County, entered on August 25, 1988, terminating her parental rights to her infant son, Jona-

than P.[1] Marilyn P. contends that the trial court erred in: (1) finding that there was sufficient evidence of child neglect; (2) failing to grant an improvement period; (3) terminating her parental rights on the ground that there was no reasonable likelihood that the conditions of abuse or neglect could be substantially corrected; (4) admitting the testimony of a social worker from the Department of Human Services (DHS); and (5) allowing the former prosecuting attorney to represent the infant child. We do not find reversible error, and, accordingly, the order of the Circuit Court of Marion County is affirmed.

Jonathan was born on September 20, 1986. On April 7, 1987, a temporary custody order was issued granting custody of Jonathan to DHS.[2] On April 14, 1987, a hearing was conducted to determine whether custody of Jonathan should remain with DHS. At that hearing, Nancy Riley, a worker for DHS, testified that Marilyn refused all help offered to her by DHS. The social worker testified that Marilyn did not have formula to feed Jonathan and that she expressed no concern about sleeping in a car with Jonathan despite the cold temperature. At the conclusion of the hearing, the circuit court granted temporary custody of Jonathan to DHS under the conditions set forth in the social summary prepared by Ms. Riley.

On June 25, 1987, the court issued its order granting a sixty-day assessment period based on the recommendations made at the April 14, 1987 hearing. During this assessment period, the court ordered custody to remain with DHS while Marilyn underwent psychological evaluation and counseling. The court further ordered Marilyn

---

1. We follow our past practice in juvenile and domestic relations cases which involve sensitive facts and do not use the last names of the parties. *See, e.g., State ex rel. W. Va. Dep't of Human Serv. v. Cheryl M.,* 177 W.Va. 688, 689 n. 1, 356 S.E.2d 181, 182 n. 1 (1987); *West Virginia Dep't of Human Serv. v. La Rea Ann C.L.,* 175 W.Va. 330, 332 S.E.2d 632 (1985); *State v. Ellsworth J.R.,* 175 W.Va. 64, 66, n. 1, 331 S.E.2d 503, 505 n. 1 (1985).

2. The forthwith custody order was issued pursuant to W.Va.Code, 49–6–3 (1984), which provides, in pertinent part:

"Upon the filing of a petition, the court may order that a child alleged to be an abused or neglected child be delivered for not more than ten days into the custody of the state department or a responsible relative, pending a preliminary hearing, if it finds that: (1) there exists imminent danger to the physical well-being of the child, and (2) there are no reasonably available alternatives to removal of the child, including, but not limited to, the provision of medical, psychiatric, psychological or homemaking services in the child's present custody."

to contact DHS to arrange for visitation with Jonathan.

By order entered on September 22, 1987, pursuant to a joint motion of the parties, the circuit court continued this matter until completion of Marilyn's psychological evaluation and ordered that custody remain with DHS until a further hearing could be held.

On May 23, 1988, a hearing was held to determine whether Marilyn's parental rights should be terminated. By order entered on August 25, 1988, the circuit court terminated her parental rights and placed permanent custody of Jonathan with DHS. It is from that decision that Marilyn now appeals.

### I.

Marilyn first contends that the temporary custody order initially removing Jonathan from her care failed to allege specific conduct which would show imminent danger to his physical well-being, as defined in W.Va.Code, 49–1–3(e) (1984). The State contends that the circuit court's finding that the child was nutritionally deprived is specifically recognized in this section as a ground for removal.[3]

■ W.Va.Code, 49–6–3 (1984), authorizes, upon the filing of a petition, the immediate, temporary taking of custody of a child by DHS when there exists an imminent danger to the physical well-being of the child and there are no reasonably available alternatives to the removal of the child. *State v. Carl B.*, 171 W.Va. 774, 301 S.E.2d 864 (1983). In *State ex rel. Miller v. Locke*, 162 W.Va. 946, 253 S.E.2d 540 (1979), we observed that W.Va.Code, 49–6–

3, allows a taking only in an emergency situation in which the welfare or the life of the child is endangered.

■ In its temporary custody order, the circuit court found that there was imminent danger to Jonathan's physical well-being "by reason of lack of cooperation from mother to provide adequate food and shelter for the child." The order concluded that there were no reasonably available alternatives to removal of the child since "the mother has refused any supportive services and fails to recognize the dangers she is exposing him to."[4]

The evidence in the record supports the circuit court's findings. Marilyn and her son had been sleeping in a car with temperatures outside as low as 30 degrees. Marilyn had no formula to feed her son. Instead, she was feeding him regular milk which was causing him to have diarrhea. Although the social worker advised Marilyn how to obtain an emergency food voucher in order to get formula for Jonathan, she refused to accept the assistance offered.

Here, there clearly existed an imminent danger to Jonathan's physical well-being, and there was sufficient evidence to warrant the circuit court's issuance of a temporary custody order. The extremely young age of the child, who was six months of age at the time of the petition, is a significant factor. As we mentioned in Syllabus Point 1, in part, of *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980), "children under the age of three years who are more susceptible to illness, need consistent close interaction with fully committed adults[.]"

---

3. W.Va.Code, 49–1–3(e), provides:

"'Imminent danger to the physical well-being of the child' means an emergency situation in which the welfare or the life of the child is threatened. Such emergency situation exists when there is reasonable cause to believe that any child in the home is or has been sexually abused or sexually exploited, or reasonable cause to believe that the following conditions threaten the health or life of any child in the home: (1) Nonaccidental trauma inflicted by a parent, guardian, custodian, sibling or a babysitter or other caretaker; or (2) A combination of physical and other signs

indicating a pattern of abuse which may be medically diagnosed as battered child syndrome; or (3) *Nutritional deprivation*; or (4) Abandonment by the parent, guardian, or custodian; or (5) Inadequate treatment of serious illness or disease; or (6) Substantial emotional injury inflicted by a parent, guardian or custodian." (Emphasis added).

4. The mother was from out of state, had no relatives in this state, and had been living in her car. She also testified that she and Jonathan had been abandoned by the child's natural father.

## II.

Marilyn next contends that the circuit court failed to grant her an improvement period and unlawfully continued to allow custody of Jonathan to remain with DHS. The State argues that Marilyn was given a sufficient period of time to improve her present conditions and that the court did not commit error by denying an improvement period.

We explained in Syllabus Point 2 of *State ex rel. W. Va. Dep't of Human Serv. v. Cheryl M.,* 177 W.Va. 688, 356 S.E.2d 181 (1987), that our statute does not automatically require an improvement period and that the parent must request such an improvement period:

"W.Va.Code, 49–6–2(b) (1984), permits a parent to move the court for an improvement period which shall be allowed unless the court finds compelling circumstances to justify a denial." [5]

The circuit court's order dated June 25, 1987, granting DHS custody of Jonathan for a sixty-day evaluation period, provided that Marilyn should contact DHS to arrange for visitation with Jonathan. By order entered on September 22, 1987, the initial sixty-day assessment period was extended by agreement of all the parties. The September 22, 1987 order in effect extended the assessment period and Marilyn's visitation privileges for another year. During this time, Marilyn did not move for an improvement period.

Even after the extension, Marilyn did not request an improvement period. The record shows that Marilyn visited her son four times during the period from June to December, 1987, and had no contact after December, 1987, until the May 23, 1988 hearing.

According to Marilyn's testimony, she had been hitchhiking in New York, New Jersey, North Carolina, Virginia, Florida, Texas, New Mexico, and Arizona. During this time, she testified that she was doing psychical research. She stated that she had been "thinking ahead to this case" and had decided to do "a little bit of my own investigation" into the areas of extrasensory perception and clairvoyance. Marilyn stated that she thought she may have a "sixth or seventh sense," and she wanted to be tested for this before the May 23, 1988 hearing.

Marilyn also had, at best, a sporadic work history along with this itinerant lifestyle. She testified that she worked approximately four weeks from December 23, 1987, until May 23, 1988. Two of those weeks she worked in Virginia Beach, but she testified that she "just couldn't handle it anymore." Marilyn testified that she worked in a warehouse in Florida for two weeks and also "did some cleaning" to make "a few dollars here and there." Marilyn stated that she received "a lot of charity from friends."

Marilyn did request an improvement period on June 29, 1988. However, this request was made after the May 23, 1988 final hearing to terminate her parental rights and approximately fourteen months after the initial temporary custody order was entered. Under W.Va.Code, 49–6–2(b) (1984), a request for an improvement period must be made "prior to final hearing." In view of this delay and of the failure to make a timely request, we find that the trial court did not err in refusing an improvement period.

## III.

Marilyn also contends that the circuit court should not have terminated her

---

**5.** W.Va.Code, 49–6–2(b), provides:
"In any proceeding under this article, the parents or custodians may, prior to final hearing, move to be allowed an improvement period of three to twelve months in order to remedy the circumstances or alleged circumstances upon which the proceeding is based. The court shall allow one such improvement period unless it finds compelling circumstances to justify a denial thereof, but may require temporary custody in the state department or other agency during the improvement period. An order granting such improvement period shall require the department to prepare and submit to the court a family case plan in accordance with the provisions of section three [§ 49–6D–3], article six-D of this chapter."

parental rights since there was insufficient evidence of no reasonable likelihood that the conditions of neglect or abuse could be substantially corrected. We have acknowledged this principle in Syllabus Point 2 of *In re R.J.M.*, *supra*:

> "Termination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, *W. Va. Code*, 49–6–5 [1977] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under *W. Va. Code*, 49–6–5(b) [1977] that conditions of neglect or abuse can be substantially corrected."

■ We find sufficient evidence to support the circuit court's finding that there was no reasonable likelihood that the conditions of neglect or abuse could be substantially corrected. William J. Fremouw, Ph. D., conducted a psychological examination of Marilyn.[6] Dr. Fremouw diagnosed Marilyn as suffering from schizophrenia. In his report, Dr. Fremouw observed that "[a]lthough [Marilyn] is not currently psychotic she has a condition which under stress will produce psychotic symptoms. Her suspicions would easily become fully developed delusions and could lead to more extreme behavior which could endanger herself or a child." Dr. Fremouw opined that Marilyn did not have the psychological

stability to function as Jonathan's primary caretaker.

Additionally, the trial court had before it evidence showing Marilyn's failure to provide proper food and shelter for her son, her lack of concern for Jonathan's welfare by failing to visit him regularly, and her itinerant lifestyle. Accordingly, we find sufficient evidence to support the trial court's termination of her parental rights.

## IV.

■ Marilyn next asserts that the trial court erred by allowing the testimony of the social worker from DHS on the ground that she did not have any personal knowledge of the case. Marilyn maintains that the social worker's testimony was hearsay under Rule 602, W.Va.R.Evid., which provides:

> "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself. This rule is subject to the provisions of Rule 703 relating to opinion testimony by expert witnesses."

The social worker who testified on behalf of DHS in this case had observed visits between Marilyn and her son and had reviewed the records in the case. Moreover, the social worker was available for cross-examination.[7] Thus, we find no reversible error.[8]

---

6. Marilyn argues that Dr. Fremouw's testimony that her parental rights should be terminated was impermissible under Rule 704 of the West Virginia Rules of Evidence because such a statement is a legal opinion. Rule 704, W.Va. R.Evid., provides that: "Testimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact." *See State v. Smith*, 178 W.Va. 104, 107 n. 1, 358 S.E.2d 188, 191 n. 1 (1987).

This proceeding was not tried before a jury. We have said that, in such an instance, even if the evidence was improper, it is not error for the court to hear it. This is based on the premise that the judge is fully competent to disregard inadmissible evidence. *In re E.H.*, 166 W.Va. 615, 276 S.E.2d 557 (1981); *Farley v. Farley*, 136 W.Va. 598, 68 S.E.2d 353 (1951). In this proceeding, the trial judge indicated that he would make the ultimate decision as to the termi-

nation of Marilyn's rights notwithstanding Dr. Fremouw's conclusions.

7. These facts differ from those in *In Interest of S.C.*, 168 W.Va. 366, 284 S.E.2d 867 (1981), where DHS chose not to introduce any testimony from the social workers who prepared the reports incorporated into the neglect petition. The mother in that case argued that DHS's decision not to call these social workers to testify or to offer their reports into evidence violated her statutory right to cross-examine witnesses. We held that there was no statutory requirement that DHS call any or all social workers involved in the case nor was DHS's decision not to call these witnesses a violation of the mother's statutory right to cross-examine witnesses.

8. Marilyn asserts that the court erred in allowing the former assistant prosecuting attorney to represent Jonathan as his guardian ad litem.

V.

For the above stated reasons, the judgment of the Circuit Court of Marion County is affirmed.

Affirmed.

There is nothing in the record that indicates the former assistant prosecuting attorney was in office or had anything to do with representing the State in the initial stages of this case. Nor is there any specific assertion of a conflict of interest or prejudice resulting from such representation, except the vague charge that the attorney had at one time handled neglect cases for DHS. We find no merit in this argument.