466 S.E.2d 189

**In re DANIELLE T.**

No. 23076.

Supreme Court of Appeals of West Virginia.

Submitted Nov. 28, 1995.

Decided Dec. 12, 1995.

Darrell V. McGraw, Jr., Attorney General, Joanna Bowles and B. Allen Campbell, Assistant Attorney General, Charleston, for Appellant West Virginia Department of Health and Human Resources.

E. Lynn Phillips, Philippi, Guardian Ad Litem for Danielle T.

Howard M. Ferris, Grafton, for Appellee Peggy Sue T.

Timothy J. Kerns, Philippi, for Appellee Johnny Ray T.

PER CURIAM:

This case is before this Court upon an appeal from the final order of the Circuit Court of Barbour County, West Virginia, entered on May 23, 1995. The case concerns the alleged abuse and neglect of Danielle T., an infant.[1] The appellant, the West Virginia Department of Health and Human Resources (hereinafter Department), contends that the circuit court committed error in not terminating the parental rights of the appellees, Johnny Ray T. and Peggy Sue T. The final order, which directed the appellant to return Danielle to the appellees, was stayed by this Court pending the outcome of this appeal. For the reasons expressed below, we reverse the final order and terminate the parental rights of the appellees to Danielle.

**I**

The facts in this case are distressing. The appellees are the natural parents of Danielle, who was born in May 1990. The appellees, Danielle and the appellees' three other children, Brandy, born in 1984, Ashley, born in 1985, and Dustin, born in 1992, resided in the same household. On February 6, 1994, the appellees brought Danielle, age three, to Davis Memorial Hospital in Elkins, West Vir-

ginia. The appellees indicated to hospital authorities that Danielle had been sick for a few days and was unresponsive. Upon an initial medical examination at Davis Memorial Hospital, Danielle was immediately flown to Ruby Memorial Hospital in Morgantown, West Virginia, for more comprehensive treatment.

At Ruby Memorial Hospital, Danielle, emaciated and in shock, was found to have the following medical conditions: (1) pneumonia, (2) scratches and scars on her back, (3) bruises about the head, (4) four missing teeth, (5) missing patches of hair, (6) a cut on one ear, (7) burns upon the inside of both arms, (8) severe dehydration and (9) severe malnutrition. The record indicates that Danielle's state of malnutrition was particularly egregious because it had caused brain damage in addition to its manifestation in the form of visible sores around Danielle's mouth. The medical evidence indicated that the sores around the mouth were caused by a vitamin deficiency. At the time of her admission to Ruby Memorial Hospital, Danielle was also recovering from surgery conducted in 1993 with regard to a dislocated hip.

On February 17, 1994, the appellant Department, with the assistance of the Barbour County Prosecuting Attorney, filed a petition in circuit court seeking immediate custody of Danielle. The appellant alleged that Danielle was an abused and neglected child. *W.Va.Code*, 49–1–3 [1994]; *W.Va.Code*, 49–6–1 [1992], *et seq.* Moreover, the appellant requested that the appellees' other children undergo a medical examination.

Upon receipt of the petition, and finding the existence of imminent danger to Danielle and the absence of a reasonable alternative to removal from the appellees' home, the circuit court ordered that temporary custody of Danielle be given to the appellant. *W.Va. Code*, 49–6–3(a) [1992]. Pursuant to that order, the circuit court appointed a guardian ad litem to represent Danielle and also appointed counsel to represent the appellees. The appellant has since placed Danielle in foster care. Furthermore, although the appellees'

---

1. We follow our practice in domestic relations cases involving sensitive matters and use initials to identify the parties, rather than full names. *In*

*the matter of Jonathan P.,* 182 W. Va. 302, 303 n. 1, 387 S.E.2d 537, 538 n. 1 (1989).

other children, Brandy, Ashley and Dustin, as well as Danielle, were named as parties in the appellant's petition, the circuit court ultimately dismissed those three children from this litigation.

Several evidentiary hearings were conducted by the circuit court upon the question of the alleged abuse and neglect of Danielle. At the end of each hearing, the circuit court continued the out-of-home placement of Danielle. The final hearing in the case was conducted on May 17, 1995, and the final order was entered on May 23, 1995.

As set forth in the final order, the circuit court found that Danielle's condition in February 1994 could have been fatal and that the appellees should have sought medical and professional assistance for Danielle sooner than they did. However, the circuit court further found that the appellees did not physically abuse Danielle and did not intentionally neglect her, although, in the words of the circuit court, the appellees were guilty of "passive neglect." The circuit court ordered that custody of Danielle be returned to the appellees, subject to a twelve-month improvement period and supervision by the appellant Department. As reflected in the final order, both the appellant and the guardian ad litem for Danielle objected to the ruling of the circuit court.

In this appeal, the appellant Department, emphasizing the severity of Danielle's injuries, contends that Danielle suffered extensive abuse and neglect and that the parental rights of the appellees should have been terminated by the circuit court. The appellees, on the other hand, contend that Danielle's injuries resulted from causes other than abuse and neglect and that, in any event, the appellant failed to establish compelling circumstances for the denial of an improvement period.

## II

Chapter 49 of the West Virginia Code is entitled "Child Welfare," and *W.Va.Code*, 49–1–3 [1994], therein defines "abused child" as a child who is harmed or threatened by "[a] parent, guardian or custodian who knowingly or intentionally inflicts, attempts to inflict or knowingly allows another person to inflict,

physical injury or mental or emotional injury, upon the child or another child in the home[.]" In addition, *W.Va.Code*, 49–1–3 [1994], defines a "neglected child" as a child who is harmed or threatened "by a present refusal, failure or inability of the child's parent, guardian or custodian to supply the child with necessary food, clothing, shelter, supervision, medical care or education, when such refusal, failure or inability is not due primarily to a lack of financial means on the part of the parent, guardian or custodian[.]"

Article 6 of chapter 49 is entitled "Procedure in Cases of Child Neglect or Abuse" and provides various remedies for the protection of children, including, in certain circumstances, the termination of parental rights. Specifically, pursuant to *W.Va.Code*, 49–6–5(a)(6) [1992], a circuit court may:

[u]pon a finding that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future, and when necessary for the welfare of the child, terminate the parental or custodial rights and/or responsibilities of the abusing parent and commit the child to the permanent sole custody of the nonabusing parent, if there be one, or, if not, to either the permanent guardianship of the state department or a licensed child welfare agency.

Moreover, *W.Va.Code*, 49–6–5(b) [1992], provides:

As used in this section, "no reasonable likelihood that conditions of neglect or abuse can be substantially corrected" shall mean that, based upon the evidence before the court, the abusing adult or adults have demonstrated an inadequate capacity to solve the problems of abuse or neglect, on their own or with help. Such conditions shall be deemed to exist in the following circumstances, which shall not be exclusive:

. . . .

(5) The abusing parent or parents have repeatedly or seriously injured the child physically or emotionally . . . and the degree of family stress and the potential for further abuse and neglect are so great as to preclude the use of resources to miti-

gate or resolve family problems or assist the abusing parent or parents in fulfilling their responsibilities to the child[.]

■ The above provisions of *W.Va.Code*, 49–6–5 [1992], are substantially the same as in the 1977 version of that statute, which this Court cited in *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980). In syllabus point 2 of *In re R.J.M.* we held:

> Termination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, *W.Va.Code*, 49–6–5 [1977] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under *W.Va.Code*, 49–6–5(b) [1977] that conditions of neglect or abuse can be substantially corrected.

Syl. pt. 1, *In re Brianna Elizabeth M.*, 192 W.Va. 363, 452 S.E.2d 454 (1994); syl. pt. 1, *In re Jeffrey R.L.*, 190 W.Va. 24, 435 S.E.2d 162 (1993); syl. pt. 4, *In the matter of Jonathan P.*, 182 W.Va. 302, 387 S.E.2d 537 (1989); syl. pt. 4, *State v. C.N.S.*, 173 W.Va. 651, 319 S.E.2d 775 (1984). *See also*, Mary J. Cavins, Annotation, *Physical Abuse of Child by Parent as Ground for Termination of Parent's Right to Child*, 53 A.L.R.3d 605 (1973).

In *In re R.J.M.*, this Court upheld a circuit court's termination of parental rights, without an improvement period, where the parents had permitted the child, under three years old, to come very close to starvation. The child's starvation was averted by the intervention of outside authorities. The parents also declined to cooperate with medical experts and social workers concerning the child's welfare. In *In re R.J.M.*, this Court stated that starvation is a particularly insidious type of child abuse and that children under three years of age, compared to older children, have a far greater susceptibility to illness. 164 W.Va. at 500–501, 266 S.E.2d at 117.

■ The *In re R.J.M.* case was subsequently cited by this Court in *In re Jeffrey R.L.*, 190 W.Va. 24, 435 S.E.2d 162 (1993). In *In re Jeffrey R.L.*, a guardian ad litem asserted that the circuit court erred in failing to terminate the parental rights of an infant, where the infant had suffered numerous bone fractures, and physicians had diagnosed the infant as suffering from battered child syndrome. Noting that the mother's explanations for the infant's injuries were inconsistent with the medical evidence[2] and that neither the mother nor the father was cooperative with regard to identifying the perpetrator of the injuries, this Court, in *In re Jeffrey R.L.*, agreed with the guardian *ad litem* and held that there was clear and convincing evidence in the record warranting the termination of parental rights. 190 W.Va. at 35, 435 S.E.2d at 173. As we stated in syllabus point 3 of *In re Jeffrey R.L.*:

> Parental rights may be terminated where there is clear and convincing evidence that the infant child has suffered extensive physical abuse while in the custody of his or her parents, and there is no reasonable likelihood that the conditions of abuse can be substantially corrected because the perpetrator of the abuse has not

---

**2.** In Jeffrey R.L., this Court emphasized the inconsistency between the mother's explanations of the infant's injuries and the medical evidence:

> X-rays revealed that Jeffrey R.L. suffered fifteen fractures to his skull, clavicle, ribs, arms and legs. It is undisputed that Jeffrey R.L. suffered these extensive injuries as a result of physical abuse, and the physicians diagnosed him as suffering from battered child syndrome.
>
> Yet, his mother, Gail L., gave several possible explanations for the injuries to Jeffrey R.L. She stated that he could have suffered these injuries while he was rolling around in his crib. However, the crib was found by the social worker to be well-padded. Gail L. also stated that his injuries could be the result of a genetic bone disease from which her grandfather suffered. Yet, after several tests were performed at West Virginia University Hospital, there was no indication that Jeffrey R.L. suffered from any bone disease. Furthermore, Gail L. offered the explanation that Jeffrey R.L. suffered his injuries during birth, despite the fact that the evidence in the record reveals Gail L. experienced a normal vaginal delivery. None of the evidence in the record supports any of Gail L.'s explanations of Jeffrey R.L.'s injuries.

190 W.Va. at 34, 435 S.E.2d at 172. *See also In the Interest of Darla B.*, 175 W.Va. 137, 331 S.E.2d 868 (1985), emphasizing in a termination of parental rights case that the parents' explanations for the injuries to the child were inconsistent with the medical evidence.

been identified and the parents, even in the face of knowledge of the abuse, have taken no action to identify the abuser.

■ In the case before this Court, the testimony focused upon the burn injuries to the inside of Danielle's arms and to her malnutrition, although as described above, Danielle suffered several other injuries. According to the appellees, Danielle received the burns from a defective vaporizer which had been sitting by her bed. That explanation was disputed, however, by Doctor Angela Rosaf who examined Danielle at Ruby Memorial Hospital in February 1994. Doctor Rosaf indicated that, even if Danielle had been inquisitive toward the vaporizer, she could not have sustained burns located upon the inside of both arms, especially, as here, in the absence of corresponding burns upon the chest.

With regard to the malnutrition, the appellees stated that Danielle had always been a fussy eater and that just prior to her hospitalization in February 1994 Danielle had taken in even less food and fluids because of her flu-like symptoms. Again, however, the appellees were contradicted by medical testimony. Doctor Monica Gingold, a neurologist at Ruby Memorial Hospital, testified that a CAT scan examination revealed that Danielle had suffered brain damage of a type consistent with malnutrition and that some of the effects of the brain damage were permanent.[3] Moreover, Doctor Rosaf testified that Danielle's malnutrition had occurred over a period of months and had caused the sores present upon Danielle's mouth. Furthermore, Doctor Rosaf indicated that Danielle did not have an eating disorder.[4]

In addition to the explanations of Danielle's injuries, the appellees submitted to the circuit court the report of Allan L. LaVoie, a psychologist, who indicated that Danielle's mother, Peggy Sue T., had no inclinations toward child abuse or neglect. The appellees also submitted the testimony of John M. Marstiller, a psychologist, who found that Danielle's father, Johnny Ray T. was not likely to abuse or neglect children. In addition, the appellees submitted the testimony of Barbour County Deputy Sheriff Richard R. Gordon, who investigated the appellees' home in May 1994 and testified that he did not believe that the appellees had abused Danielle. It should be noted, however, that Allan L. LaVoie, though under subpoena, did not appear before the circuit court to testify. Moreover, John M. Marstiller indicated that Johnny Ray T. had "somewhat inappropriate

3. Dr. Gingold testified as follows:
   Q. Now, could you tell us what tests were performed?
   A. Well, that night they were limited because she was so critically ill, but there was a CAT scan done within hours of her arrival that showed pronounced atrophy of the brain, but also showed lesions in the brain stem.
   Q. Doctor, is atrophy of the brain caused— among other things, due to malnutrition?
   A. Definitely.
   Q. Did the atrophy of the brain that you observed appear consistent with a history of malnutrition?
   A. Chronic malnutrition.
   . . . .
   Q. One final question. Do you believe that she will be able to fully recover from the condition that she presented herself with in February; or that she will continue to suffer permanent deficits?
   A. She will have permanent deficits definitely.

4. Doctor Rosaf testified as follows:
   Q. Did you take a history from the parents as to her intake of fluids and nutrition in the preceding period?

   A. Yes, I did. They said the child's intake had been down for a few days prior to admission—that she had a respiratory infection. But prior to that she had the usual amount of three meals a day and vitamin supplement protein milk shake—one can a day.
   Q. Based on your examination and findings did you find that history to be consistent with what you observed?
   A. No, it was not. The amount of protein— she was receiving was very little protein for several months, and the riboflavin deficiency— the sores around her mouth indicates she was not receiving vitamins or riboflavin.
   . . . .
   Q. Could you characterize this condition that you observed?
   A. Culture cure.
   Q. And is there a classical scenario where you observe this?
   A. You see this typically in third world countries where children because of poverty do not receive protein as a food source.
   . . . .
   Q. No possibility of some type of eating disorder?
   A. No.

expectations regarding children's developmental capabilities." Furthermore, Deputy Gordon testified that, although he did not believe that Danielle had been abused, he did believe that she had been neglected by the appellees.

This Court is not unmindful that the parental rights of the appellees with regard to Danielle are entitled to significant consideration. Syl. pt. 1, *In re Willis,* 157 W.Va. 225, 207 S.E.2d 129 (1973). However, this case falls squarely within the principles of *In re R.J.M.* and *In re Jeffrey R.L., supra.* As in *In re R.J.M.,* the appellees in this case permitted Danielle to come very close to starvation. Importantly, and consistent with *In re R.J.M.,* the circuit court in this case expressly stated that the intervention of the appellant Department in February 1994 "was necessary to alleviate the malnutrition and medical problems suffered by [Danielle] which might otherwise have been fatal." Moreover, in *In re Jeffrey R.L.,* this Court indicated that there was no reasonable likelihood that the conditions of abuse could be substantially corrected because the perpetrator had not been identified, and the parents had taken no action to identify the abuser. That is also the case here. In this case, the appellees sought to explain Danielle's burn and malnutrition conditions with testimony inconsistent with the medical evidence. The photographs alone of Danielle's injuries, submitted as a part of the record before this Court, render the appellees' testimony rather unconvincing. Danielle's other injuries, such as the scratches, scars, bruises, missing teeth and the cut upon her ear, were addressed only tangentially by the appellees. Neither of the appellees acknowledged that any abuse or neglect of Danielle took place.

Accordingly, this Court is of the opinion that the record contains clear and convincing evidence of extensive physical abuse and neglect of Danielle and that there is no reasonable likelihood that the conditions can be substantially corrected. Syl. pt. 3, *In re Jeffrey R.L., supra.* The fact that the circuit court found Danielle's injuries to be nearly fatal and that the record indicates that Danielle's conditions have substantially improved in out-of-home placement, *a fortiori,* support those conclusions. Upon all of the above, this Court is of the opinion that the circuit court committed error in granting the improvement period, and the parental rights of the appellees to Danielle are hereby terminated. This case is remanded to the circuit court for the development of a plan concerning Danielle's prospective care and permanent placement. *W.Va.Code,* 49–6–5 [1992]. The appointment of the guardian ad litem upon Danielle's behalf shall continue until a permanent placement is made. *In re Jeffrey R.L., supra,* 190 W.Va. at 35, 435 S.E.2d at 173.

We have on a number of occasions and in varying contexts recognized a child's right to continued association with significant figures in his or her life. *In re Christina L.,* 194 W.Va. 446, 460 S.E.2d 692 (1995); *James M. v. Maynard,* 185 W.Va. 648, 408 S.E.2d 400 (1991); *Honaker v. Burnside,* 182 W.Va. 448, 388 S.E.2d 322 (1989).

As we recognized in syllabus point 5 of *In re Christina L.:*

> When parental rights are terminated due to neglect or abuse, the circuit court may nevertheless in appropriate cases consider whether continued visitation or other contact with the abusing parent is in the best interest of the child. Among other things, the circuit court should consider whether a close emotional bond has been established between parent and child and the child's wishes, if he or she is of appropriate maturity to make such request. The evidence must indicate that such visitation or continued contact would not be detrimental to the child's well being and would be in the child's best interest.

Similarly, we have recognized that where there is a termination of parental rights, all efforts should be made to preserve the child's rights to a continued relationship with her only other immediate family blood relatives, her siblings.[5]

---

5.  As we said in *Maynard:*
    Trends both in social work and the law relating to child placement indicate an increased

awareness of children's rights to such continued association with siblings and other meaningful figures. *See generally,* Hegar, *Legal and*

Upon remand, the circuit court should review all of the evidence on these issues in the context of a permanency plan, including the monitoring of the siblings as hereinafter required, to determine the extent to which such continued parental or sibling association is in the child's best interests.

In view of the above, this Court is also concerned about the health, safety and welfare of the appellees' remaining children, Brandy, Ashley and Dustin. Upon remand, therefore, the appellant Department is directed to monitor the progress of Brandy, Ashley and Dustin in order to make sure that those children are not the subject of abuse or

*Social Work Approaches to Sibling Separation in Foster Care*, 67 Child Welfare 113 (1988); Reddick, Juv.Just., Nov. 1974, 31–2. The increased professional emphasis in social work on the sibling relationship is consistent with the broadening focus of the literature about separation. Hegar, *supra*, 67 Child Welfare at 113. The growing legal emphasis on the best interests of the child as the primary criterion for child placement decisions facilitates efforts to preserve stable relationships for children. Hegar, *supra.*, Soc.Serv.Rev., Sept., 1983, at 429; *see also* Note, *Visitation Beyond the Traditional Limitations*, 60 Ind.L.J. 191 (1984).

neglect. Syl. pt. 2, *In re Christina L.*, 194 W.Va. 446, 460 S.E.2d 692 (1995).[6]

The final order of the Circuit Court of Barbour County, entered on May 23, 1995, is reversed, and this case is remanded to that court for proceedings consistent with this opinion.

Reversed and remanded.

185 W.Va. at 658, 408 S.E.2d at 410.

**6.** Syllabus point 2 of *In re Christina L., supra,* states:

Where there is clear and convincing evidence that a child has suffered physical and/or sexual abuse while in the custody of his or her parent(s), guardian, or custodian, another child residing in the home when the abuse took place who is not a *direct* victim of the physical and/or sexual abuse but is at risk of being abused is an abused child under W.Va. Code, 49–1–3(a) (1994).