491 S.E.2d 607

**In the Matter of TAYLOR B.**

No. 23997.

Supreme Court of Appeals of
West Virginia.

Submitted June 3, 1997.

Decided July 14, 1997.

**62**

Darrell V. McGraw, Jr., Attorney General, Barbara L. Baxter, Assistant Attorney General, Charleston, for the West Virginia Department of Health and Human Resources.

Janet D. Preston, Cooper & Preston, Parsons, for Regina B.

Pat A. Nichols, Nichols & Nichols, Parsons, for James B.

McHUGH, Justice:

This case is before this Court upon appeal from the final order of the Circuit Court of Tucker County, West Virginia, entered on March 12, 1996. This is a child abuse and neglect matter concerning injuries suffered by Taylor B., a three-month-old infant, while in the care of his parents, James B. and Regina B.[1] According to the West Virginia Department of Health and Human Services, the injuries were consistent with "shaken baby syndrome," and the rights of the parents should have been terminated. However, as the final order indicates, the circuit court concluded that, although the injuries to Taylor B. "could have" been caused by James B., the parents have since been educated concerning shaken baby syndrome and that, therefore, a termination of parental rights was not warranted.

This Court has before it the petition for appeal, all matters of record and the briefs and argument of counsel. Upon a careful review of the record, and for the reasons expressed below, this Court is of the opinion that the circuit court committed error in failing to terminate the parental rights of

---

**1.** We follow our practice in domestic relations cases involving sensitive matters and use initials to identify the parties, rather than full names. *In* *Matter of Jonathan P.,* 182 W.Va. 302, 303 n. 1, 387 S.E.2d 537, 538 n. 1 (1989).

James B. and Regina B. to Taylor B. We reach this conclusion in view of clear and convincing proof that the injuries to Taylor B. were, in fact, consistent with shaken baby syndrome and incurred while in the sole presence of James B., that the explanations of the parents to the contrary were inconsistent with the medical evidence, and that the parents have failed to acknowledge that any abuse or neglect of Taylor B. occurred.

Accordingly, we reverse the final order and remand this case to the circuit court for the entry of an order (1) terminating the parental rights of James B. and Regina B. to Taylor B., (2) directing the Department of Health and Human Resources to develop a permanency plan under the provisions of *W. Va.Code*, 49–6–5 [1996], for the permanent placement of Taylor B. in another home and (3) granting the parents supervised visitation. In so ruling, this Court is not unmindful that Taylor B. is now 3 years of age · and has continued to reside with James B. and Regina B. throughout this litigation. We, therefore, further order the circuit court to explore, with the assistance of the parties, the possibility of the permanent placement of Taylor B. with a family relative of the parents. In the event the possibility of such placement with a family relative is confirmed, the Department shall develop a plan for the removal of Taylor B. from the home of James B. and Regina B. upon a progressive basis, subject to monitoring by the Department of Taylor B.'s safety.

## I

The facts in this case are disturbing. Regina B. and James B., her male companion, lived in a home near Parsons, West Virginia, in Tucker County.[2] Taylor B., born on January 23, 1994, is the sole child of the relation-

ship. On May 4, 1994, Regina B., upon leaving her employment for the day, picked up Taylor B. at her mother's house and returned home. Upon her arrival, James B. asked her to go back to her mother's house, which was across the road, to borrow a vacuum cleaner. Regina B. placed Taylor B., then three months old, in a baby swing and left to get the vacuum cleaner. When she returned approximately five minutes later she found Taylor B. lying on the floor, limp and unresponsive. James B., who had been alone with Taylor B. during that time, told Regina B. that he had placed Taylor B. upon the couch and that, while he was working in another area of the home, Taylor B. had fallen to the floor. The couch seat was approximately 12 inches from the floor, and a coffee table was nearby. The floor was carpeted.

James B. and Regina B. immediately sought medical treatment for Taylor B. at the Tucker County Emergency Ambulatory Center and later at Davis Memorial Hospital in Elkins, West Virginia. Soon after, Taylor B. was admitted at Ruby Memorial Hospital in Morgantown, West Virginia. Taylor B. remained at the latter hospital until his discharge on May 11, 1994.

As stated on the discharge summary from Ruby Memorial Hospital, Taylor B. was diagnosed with a subdural hematoma, "interhemispheric blood," and retinal hemorrhages, as a result of the incident. In particular, Dr. Susan A. Schmitt, who treated Taylor B. at the Emergency Ambulatory Center, later testified that Taylor B. was in "grave danger" on May 4, 1994, and was suffering from shaken baby syndrome. Moreover, Dr. Schmitt testified that she did not believe that Taylor B. had sustained the injuries from falling off a couch.[3] In addition, Dr. John B.

---

2. As the brief filed by James B. in this Court indicates, James B. and Regina B. were married subsequent to the events in question. Specifically, the brief of James B. States: "The parties who are now married, were not married at the time but were living together near Seven Islands in Tucker County."

3. During her testimony, Dr. Schmitt stated:

[Taylor B.] was not able to respond, would not look at anything. He was lying very limp on the table with his eyes open but his eyes

rolled back and rhythmically moving from left to right. He did not respond to verbal commands.... I did a physical exam and found that he had a bulging fontanel which is the soft spot of the head which is indicative of some kind of an intracranial process., It meant that there was increased pressure · inside of his brain. I did a physical exam and I was very concerned about this child.... [H]e was in danger. If you look at the kinds of injuries that he sustained, thirty percent of these children die, thirty percent of these children are

Bodensteiner, a pediatric neurologist who examined Taylor B. at Ruby Memorial Hospital, testified that, as a result of the incident, Taylor B. sustained a subdural hematoma and retinal hemorrhages, consistent with shaken baby syndrome. Moreover, as did Dr. Schmitt, Dr. Bodensteiner stated that the injuries Taylor B. sustained were inconsistent with a fall from a couch.[4]

Upon his discharge from Ruby Memorial Hospital, the Department of Health and Human Resources obtained emergency custody of Taylor B., and a petition seeking the termination of the parental rights of James B. and Regina B. was filed. *W. Va. Code*, 49–6–1 [1992]. At about that time, James B. moved out of the parties' Tucker County residence. On May 17, 1994, the circuit court conducted a preliminary hearing, at the conclusion of which an order was entered returning Taylor B. to Regina B. In addition, James B. was granted supervised visitation. Subsequently, the circuit court entered an order granting Regina B. an improvement period.

In October 1994, the Department of Health and Human Resources completed a written family case plan, applicable to both parents, to assist the parties and the circuit court in the ultimate disposition of the case. *W. Va. Code*, 49–6–2 [1992]. The plan required, in part, an acknowledgment by James B. and Regina B. of any "conditions and circumstances" relevant to the safety and well-being of Taylor B. However, although they subsequently attended parenting classes concerning their child, both James B. and Regina B. refused to sign the family case plan. In fact, the parents have never stated or recognized that any abuse or neglect of Taylor B. occurred. Specifically, James B. asserted that, the medical evidence notwithstanding, he never shook or harmed Taylor B. in any way on May 4, 1994, or at any other time. Moreover, Regina B., although conceding that Taylor B. was seriously injured on May 4, asserted that James B. was not responsible for the injuries, "because that's what he told me."

In addition to the abuse and neglect petition filed against James B. and Regina B. by the Department of Health and Human Resources, criminal proceedings were instituted against James B. by the Tucker County prosecuting attorney concerning the incident of May 4, 1994. On March 29, 1995, the criminal proceeding was resolved upon James B.'s plea of *nolo contendere* to the misdemeanor offense of presenting false information to attending medical personnel. *W. Va. Code*, 61–8D–7 [1988].[5] According to James B. and

---

seriously damaged, and only thirty percent of babies that have sustained this kind of an injury have a normal outcome neurologically.

4. It should be noted that, during the medical treatment of Taylor B. following the incident of May 4, 1994, a second, older subdural hematoma was discovered. As in the case of the injuries of May 4, 1994, the cause of the older subdural hematoma was controverted during the proceedings below. Specifically, Dr. Bodensteiner, indicating that the older injury was nonaccidental testified:

Q. In the present case where you have an old injury and a new injury are you able to, to give us an opinion as to whether it's likely that these were accidental or not? Based upon the history you had in this case?

A. Well, the history we have identifies nothing that would account for either of those injuries. So I, I, I can't say whether, I mean, I can say that the history we have doesn't correlate with it. To [injure] a child at this age twice, this badly is, in my opinion, extremely difficult to do accidentally.

On the other hand, James B. and Regina B. asserted that the second, older subdural hematoma could have occurred at Taylor B.'s birth, which had been a difficult birth, or could have been caused by an accidental kick to the head by an older child visiting the home. Nevertheless, Dr. Bodensteiner stated that Taylor B.'s medical history did not suggest that the older subdural hematoma occurred at birth. Moreover, Dr. Bordensteiner indicated that the kick to the head would have had to have been "severe" to produce such an injury.

5. Article 8D of chapter 61 of the *West Virginia Code* is entitled "Child Abuse," and *W. Va. Code*, 61–8D–7 [1988], provides:

Any person who presents false information concerning acts or conduct which would constitute an offense under the provisions of this article to attending medical personnel shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined not less than one hundred dollars nor more than one thousand dollars, and shall be confined in the county jail not more than one year.

As the record indicates, James B. was originally charged with a felony offense under *W. Va. Code*, 61–8D–3 [1992], which statute concerns the infliction of "serious bodily injury" upon a child.

the prosecuting attorney (who was representing the State in the criminal proceeding and the Department in the abuse and neglect proceeding), the *nolo contendere* plea was to result, additionally, in the dismissal of the abuse and neglect proceeding instituted by the Department. Nevertheless, upon objection by both the Department of Health and Human Resources and the guardian ad litem for Taylor B., the circuit court declined to dismiss the abuse and neglect proceeding, and, instead, a special prosecutor was appointed to represent the Department.[6] Following the *nolo contendere* plea, however, James B. moved back into the residence of Regina B. and Taylor B.

On August 31, 1995, the circuit court conducted an evidentiary hearing upon the abuse and neglect petition. The evidence of the Department consisted, chiefly, of establishing that, in spite of medical evidence to the contrary, neither James B. nor Regina B. ever acknowledged that any abuse or neglect of Taylor B. occurred. Included in the evidence of the Department was the testimony of two psychologists, Dr. Allan L. LaVoie and Dr. John M. Marstiller, who indicated that, in the absence of recognition by a parent that child abuse has occurred, the child remains at risk.

On the other hand, in addition to denying that any abuse or neglect of Taylor B. had occurred, the evidence of James B. and Regina B. consisted of establishing that they were good parents, that they had successfully completed the parenting classes required by the Department and that they had cooperated with all authorities involved in the case, short of stating that abuse and neglect had taken place.

Following the evidentiary hearing, the circuit court entered the final order of March 12, 1996, returning full custody of Taylor B. to James B. and Regina B. In language, which appears to this Court, however, to be rather uncertain, the circuit court stated:

As to this recent and acute hematoma, there appears sufficient evidence from the expert that this activity seen upon physical examination of the child and from the CT testing done, is a circumstance of 'Shaken–Impact Syndrome' applicable to infants.... This father, in handling this fussy child, could have taken him out of the swing, could have violently pushed him against the soft back of the couch, or put him violently down on the soft cushion of the couch seat. This activity could have resulted in the physical damage to the child, with the subdural hematoma and the bilateral retinal hemorrhages in the eyes.... Considering these presenting circumstances, the father and mother of this infant, together with the maternal grandmother, took all necessary action to obtain medical assistance....· The clearer and more convincing evidence adduced at the hearing is the knowledge that both the parents, with knowledge that one of them took certain actions which precipitated the mental and physical condition of the child, have now been educated as to what caused the damage.

II

As a preliminary matter, this Court notes that, in response to the petition for appeal of the Department of Health and Human Resources, James B. asserts that the abuse and neglect petition filed against him and Regina B. should have been dismissed as a part of his *nolo contendere* plea to the offense of presenting false information to attending medical personnel. According to James B. that misdemeanor conviction resulted from a plea bargain, part of which included a promise by the prosecuting attorney to terminate the abuse and neglect proceeding. This Court concludes, however, that James B.'s assertion is without merit.

In the case of *In re Jonathan G.,* 198 W.Va. 716, 482 S.E.2d 893 (1996), this Court recognized the dual role of county prosecutors "in the area of civil/criminal abuse and neglect cases." Citing the provisions of *W. Va.Code,* 49-6-10 [1984], which requires prosecuting attorneys to "fully and promptly cooperate" with those seeking relief in child

---

6. It should be noted that, although both the criminal proceeding and the abuse and neglect proceeding were instituted in Tucker county, separate circuit court judges presided in those matters.

abuse and neglect matters, we stated in that case that "the prosecuting attorney stands in the traditional role of a lawyer when representing DHHR in connection with abuse and neglect proceedings." 198 W.Va. at 732, 482 S.E.2d at 909. Thus, observing that the prosecutor's authority is more limited within the civil arena of abuse and neglect proceedings, as compared to the criminal side of such proceedings, the opinion, in *In re Jonathan G.*, holds: "Based on our conclusion that the prosecuting attorney's role as related to DHHR in an abuse and neglect proceeding is that of a traditional attorney-client, we further determine that a prosecuting attorney has no independent right to formulate and advocate positions separate from its client in these cases." 198 W.Va. at 732, 482 S.E.2d at 909.

▇▇ The above principle thus expressed in *In re Jonathan G.* comports with the recent decision of this Court in *State ex rel. Diva P. v. Kaufman*, 200 W. Va. 555, 490 S.E.2d 642 (1997). In *State ex rel. Diva P.*, we stated in syllabus point 4:

In civil abuse and neglect cases, the legislature has made DHHR the State's representative. In litigations that are conducted under State civil abuse and neglect statutes, DHHR is the client of county prosecutors. The legislature has specifically indicated through W.Va.Code, § 49-6-10 (1996) that prosecutors must *cooperate* with DHHR's efforts to pursue civil abuse and neglect actions. The relationship between DHHR and county prosecutors under the statute is a pure attorney-client relationship. The legislature has not given authority to county prosecutors to litigate civil abuse and neglect actions independent of DHHR. Such authority is granted to prosecutors only under State criminal abuse and neglect statutes. Therefore, all of the legal and ethical principles that govern the attorney-client relationship in general, are applicable to the relationship that exists between DHHR and county prosecutors in civil abuse and neglect proceedings.

(emphasis provided).

▇▇ In the framework of *In re Jonathan G.* and *State ex rel. Diva P.*, it is, therefore,

clear that the circuit court, in this case, ruled correctly in declining to dismiss the abuse and neglect petition against James B. and Regina B. and in appointing a special prosecutor to represent the Department. Accordingly, as a corollary to those cases, this Court holds that a civil child abuse and neglect petition instituted by the West Virginia Department of Health and Human Resources pursuant to *W. Va.Code*, 49–6–1 [1992], *et seq.*, is not subject to dismissal pursuant to the terms of a plea bargain between a county prosecutor and a criminal defendant in a related child abuse prosecution. Contrary to the assertion of James B., civil abuse and neglect proceedings focus directly upon the safety and well-being of the child and are not simply "companion cases" to criminal prosecutions. As this Court stated in syllabus point 3 of *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996): "Although parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." Here, the circuit court quite properly stated: "I still am not going to accept the plea bargain agreement in this civil case. At this time, I'm finding it is in the best interest of the child that I proceed [.]"

### III

In this case, the Department of Health and Human Resources and the guardian ad litem for Taylor B., contend that the circuit court committed error in not terminating the parental rights of James B. and Regina B. According to the Department and the guardian ad litem, the evidence established that Taylor B. was the victim of shaken baby syndrome, a life threatening, nonaccidental circumstance. Moreover, the parents admitted that Taylor B. sustained serious injuries on May 4, 1994, even though they denied any abuse or neglect. In that regard, the Department and the guardian ad litem indicate that the failure of James B. and Regina B. to acknowledge that abuse or neglect occurred, in spite of medical evidence to the contrary, and the parents' refusal to sign the family case plan, erected a barrier to Taylor B's safety. James B., on the other hand, denies

abusing or neglecting Taylor B. in any way, and Regina B. supports James B.'s version of the incident in question. In addition, both parents contend that the evidence proved that they were good parents who attended parenting classes and that they cooperated with all authorities involved in the case. Thus, James B. and Regina B. assert that the final order of the circuit court should be affirmed.

■ In syllabus point 1 of *In the Interest of: Tiffany Marie S.,* 196 W.Va. 223, 470 S.E.2d 177 (1996), this Court observed:

Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

*See also* syl. pt. 1, *State ex rel. Virginia M. v. Virgil Eugene S.,* 197 W.Va. 456, 475 S.E.2d 548 (1996).

An "abused child" is defined in *W. Va. Code,* 49–1–3 [1994], as a child who is harmed or threatened by "[a] parent, guardian or custodian who knowingly or intentionally inflicts, attempts to inflict or knowingly allows another person to inflict, physical injury or mental or emotional injury, upon the child or another child in the home[.]"[7] In addition, *W. Va.Code,* 49–1–3 [1994], defines a "ne-

glected child" as a child who is harmed or threatened "by a present refusal, failure or inability of the child's parent, guardian or custodian to supply the child with necessary food, clothing, shelter, supervision, medical care or education, when such refusal, failure or inability is not due primarily to a lack of financial means on the part of the parent, guardian or custodian [.]"

In particular, with regard to the termination of parental rights, *W. Va.Code,* 49–6–5(a)(6) [1992], provides that a circuit court may

[u]pon a finding that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future, and when necessary for the welfare of the child, terminate the parental or custodial rights and/or responsibilities of the abusing parent and commit the child to the permanent sole custody of the nonabusing parent, if there be one, or, if not, to either the permanent guardianship of the state department or a licensed child welfare agency.

Moreover, *W.Va.Code,* 49–6–5(b) [1992], provides:

As used in this section, 'no reasonable likelihood that conditions of neglect or abuse can be substantially corrected' shall mean that, based upon the evidence before the court, the abusing adult or adults have demonstrated an inadequate capacity to solve the problems of abuse or neglect, on their own or with help. Such conditions shall be deemed to exist in the following circumstances, which shall not be exclusive:

(2) The abusing parent or parents have wilfully refused or are presently unwilling to cooperate in the development of a reasonable family case plan designed to lead to the child's return to their care, custody and control [.]

■ In *In re Jeffrey R.L.,* 190 W.Va. 24, 435 S.E.2d 162 (1993), a guardian ad litem asserted that the circuit court erred in failing

---

**7.** In syllabus point 7 of *West Virginia Department of Health and Human Resources ex rel. Wright v. Doris S.,* 197 W.Va. 489, 475 S.E.2d 865 (1996), this Court stated that the term "knowingly" as used in *W. Va.Code,* 49–1–3, "does not require

that a parent actually be present at the time the abuse occurs, but rather that the parent was presented with sufficient facts from which he/she could have and should have recognized that abuse has occurred."

to terminate the parental rights to an infant, where the infant had suffered numerous bone fractures, and physicians had diagnosed the infant as suffering from battered child syndrome. Noting that the mother's explanations for the infant's injuries were inconsistent with the medical evidence and that neither the mother nor the father was cooperative with regard to identifying the perpetrator of the injuries, this Court, in *In re Jeffrey R.L.*, agreed with the guardian ad litem and held that there was clear and convincing evidence in the record warranting the termination of parental rights. As syllabus point 3 of *In re Jeffrey R.L.* holds:

> Parental rights may be terminated where there is clear and convincing evidence that the infant child has suffered extensive physical abuse while in the custody of his or her parents, and there is no reasonable likelihood that the conditions of abuse can be substantially corrected because the perpetrator of the abuse has not been identified and the parents, even in the face of knowledge of the abuse, have taken no action to identify the abuser.

*See W. Va. Code*, 49–6–2 [1996], which requires that abuse and neglect must be established by clear and convincing proof; syl. pt. 2, *In re Danielle T.*, 195 W.Va. 530, 466 S.E.2d 189 (1995).

■ Moreover, as this Court stated in syllabus point 2 of *In the Matter of Scottie D.*, 185 W.Va. 191, 406 S.E.2d 214 (1991):

> Termination of parental rights of a parent of an abused child is authorized under *W. Va. Code*, 49–6–1 to 49–6–10, as amended, where such parent contends nonparticipation in the acts giving rise to the termination petition but there is clear and convincing evidence that such nonparticipating parent knowingly took no action to prevent or stop such acts to protect the child. Furthermore, termination of parental rights of a parent of an abused child is authorized under *W. Va. Code*, 49–6–1 to

49–6–10, as amended, where such nonparticipating parent supports the other parent's version as to how a child's injuries occurred, but there is clear and convincing evidence that such version is inconsistent with the medical evidence.

*See also* syl. pt. 2, *In the Interest of Darla B.*, 175 W.Va. 137, 331 S.E.2d 868 (1985).

■ In this case, the evidence is clear and convincing that Taylor B. sustained a subdural hematoma, "interhemispheric blood," and retinal hemorrhages, as a result of the incident of May 4, 1994. According to Dr. Schmitt, Taylor B. was in "grave danger" that evening, and neither Dr. Schmitt nor Dr. Bodensteiner was of the opinion that Taylor B. had sustained those injuries from falling off a couch. As the evidence of record and the final order of the circuit court indicate, the injuries Taylor B. sustained were consistent with shaken baby syndrome. Without question, shaken baby syndrome is life-threatening to an infant. *See Doris S., supra*, concerning the death of a twenty-two-month old child from shaken baby syndrome.[8]

In spite of the medical evidence, however, James B. denies that any abuse or neglect of Taylor B. occurred, and Regina B. supports James B.'s version of the incident in question. Nevertheless, as Regina B. testified on August 31, 1995:

> Q: You also did not agree or believe or admit that James did it?
>
> A: No, I did not.
>
> Q: If James, in fact, did this abuse and he continues to live in your home it can happen again, true?
>
> A: Yes.

In *Doris S., supra*, this Court stated that, for a parent to remedy the problem of abuse and neglect, "the problem must first be acknowledged." 197 W.Va. at 498, 475 S.E.2d at 874. Here, the medical evidence notwithstanding, James B. and Doris B. deny that

---

**8.** The following statement found in the brief filed by James B. in this Court raises concern:

> Dr. Boyd, a pediatrician, testified that the child at the time of the hearing, age 19 months, was not susceptible to 'Shaken Baby Syndrome' because he now had better head control. Ob-

viously, the child is now 3 years old and is even less susceptible to this type of injury than that at the time of the hearing.

At best, that statement provides nothing of value with regard to whether Taylor B. was, or may yet be, the victim of abuse or neglect.

any abuse or neglect occurred and have refused to sign the family case plan because of its indication that there may have been "conditions and circumstances" in the home adverse to the safety and well-being of Taylor B. Such conduct on the part of the parents, however, renders those conditions and circumstances untreatable. As Dr. LaVoie and Dr. Marstiller stated, in the absence of recognition by a parent that child abuse has occurred, the child remains at risk. Specifically, Dr. LaVoie testified before the circuit court as follows:

> Q: Even if Regina [B.] had went through parenting classes and counseling if she had not yet acknowledged that abuse had occurred what, who ever the person who did it would she be safe to have this child back?
>
> A: In my opinion, not.

Upon a careful review of the record, therefore, this Court is of the opinion that the injuries sustained by Taylor B. could not have occurred in the manner testified to by James B. and Regina B. before the circuit court. Rather, as indicated by the medical testimony, the injuries were consistent with shaken baby syndrome, a life-threatening circumstance. Moreover, neither James B. nor Regina B. has ever acknowledged that any abuse or neglect of Taylor B. occurred. Accordingly, this Court concludes that the circuit court committed error in failing to terminate the parental rights of James B. and Regina B.

■ In syllabus point 5 of *In re Christina L.*, 194 W.Va. 446, 460 S.E.2d 692 (1995), this Court held:

> When parental rights are terminated due to neglect or abuse, the circuit court may nevertheless in appropriate cases consider whether continued visitation or other contact with the abusing parent is in the best interest of the child. Among other things, the circuit court should consider whether a close emotional bond has been established between parent and child and the child's wishes, if he or she is of appropriate maturity to make such request. The evidence must indicate that such visitation or continued contact would not be detrimental to the child's well being and would be in the child's best interest.

*See also In re Danielle T., supra,* 195 W.Va. at 535, 466 S.E.2d at 194.

Accordingly, upon all of the above, the final order of the Circuit Court of Tucker County, entered on March 12, 1996, is reversed, and this case is remanded to the circuit court for the entry of an order (1) terminating the parental rights of James B. and Regina B. to Taylor B., (2) directing the Department of Health and Human Resources to develop a permanency plan under the provisions of *W. Va.Code,* 49-6-5 [1996], for the permanent placement of Taylor B. in another home and (3) granting the parents supervised visitation. In so ruling, this Court further orders the circuit court to explore, with the assistance of the parties, the possibility of the permanent placement of Taylor B. with a family relative of the parents. In the event the possibility of such placement with a family relative is confirmed, the Department shall develop a plan for the removal of Taylor B. from the home of James B. and Regina B. upon a progressive basis, subject to monitoring by the Department of Taylor B.'s safety.

Reversed and remanded.

WORKMAN, Chief Justice, concurring:

The opinion of the majority is well-written and absolutely correct on the law. I find the result sufficiently troubling, however, that I feel compelled to write separately. What the opinion does not reflect is that these parents were almost encouraged by the policy of the circuit court in this abuse and neglect case not to acknowledge responsibility for the abuse that occurred to Taylor. The lower court in its final order made this finding:

> This Court would come to the legal conclusion that there is no clear and convincing evidence to support the facts that these parents, or either of them, in the face of knowledge of this abuse, took no action or did not identify the perpetrator of this abuse, or are knowingly hiding the identity of the abuser, or are otherwise actually aiding and protecting the abusing parent. The clearer and more convincing evidence adduced at the hearing is the knowledge

that both the parents, with knowledge that one of them took certain actions which precipitated the mental and physical condition of the child, have now been educated as to what caused the damage.

Although the court's obvious mistake of clear law in this regard does not exonerate the parents of responsibility for their failure to acknowledge, it appears to have led at least the mother down a primrose path that will now result in the loss of parental rights to this child. What is also disturbing is that Taylor has now been in the almost constant custody of these parents for all of his three and one-half years. As we have said previously, such sudden alterations can be so traumatic that they may create an adverse impact for the duration of that child's life. As we said in syllabus point three of *James M. v. Maynard,* 185 W.Va. 648, 408 S.E.2d 400 (1991):

> It is a traumatic experience for children to undergo sudden and dramatic changes in their permanent custodians. Lower courts in cases such as these should provide, whenever possible, for a gradual transition period, especially where young children are involved. Further, such gradual transition periods should be developed in a manner intended to foster the emotional adjustment of the children to this change and to maintain as much stability as possible in their lives.

At the most recent West Virginia State Judicial Conference, Dr. Rosalind Folman, a research assistant at the University of Michigan who holds a Ph.D. in Developmental Child Psychology and Social Work, identified this problem in her remarks to the judges of this state. She urged that judges overseeing children's cases attempt to avoid at all costs the sudden, traumatic removal of children from their familiar settings.

Thus, in the event that no suitable relative is found for the permanent placement of Taylor, then at least there should be a gradual transition of this little boy to his permanent adoptive home. He should not be unceremoniously routed out of the only home he has ever known, and he should not be placed in a temporary foster home pending the location of an adoptive home. He should

be moved directly, but very gradually, to what will become his permanent adoptive home. If the Department or the guardian ad litem feel that the child is in imminent danger in the home of his biological parents, then the home of the maternal grandmother who has been very involved in his life, or some other relative who Taylor already knows and loves, should be chosen to care for him during the gradual transition.

Lastly, the circuit court in developing the post-termination visitation plan should bear in mind the necessity of minimizing the pain and trauma this little boy will endure in making this major transition in his life. Contact with the parents should be maximized, even if in a supervised setting, so as to facilitate that goal. I urge these principles be followed not for the protection of the parents' rights, but for the protection of Taylor's rights not to have further trauma visited upon his life.

STARCHER, Justice, dissenting:

I am concerned that the majority opinion has, in effect, applied a bright-line rule: unless a parent who abuses their child admits to the abuse, and unless the other parent accuses the "abuser parent" of abuse, neither parent will ever be the child's parent again.

I understand the reasoning behind this sort of rule, but because it seemingly admits to no exceptions, I think that it may run contrary to the principle of assuring that the best interests of the child are held paramount.

Probably a large percentage of parents who commit abuse to a child will never admit to the abuse—because it is a crime for which they can be imprisoned, and/or because the admission is psychologically so difficult. The same reasoning holds true for making accusations of abuse against one's fellow parent.

But it seems to me to be unreasonable to assume that parents who can't or won't "fess up" or make an accusation regarding abuse can't *ever* become and behave as acceptable parents. Nothing in our statutes says that this is a judgment that the Legislature has made, and I don't think this is an accepted principle of social science. So how can we

make this the premise of such a harsh rule, a rule that certainly will have the effect of tearing some children away from basically loving and caring parents, and placing these children into the highly problematic worlds of foster care and adoption?

In the instant case, there was a remarkable uniformity of opinion in the testimony that the mother in this case is a good, hardworking and caring parent. The evidence also showed that the father—although he very likely seriously abused the child once or twice by a fit of shaking—was otherwise a loving, decent parent who was improving and trying to do better. Moreover, it's been over three years since the shaking injury to this child, and there's been no evidence that everything is not going okay with the child in the mother's care.

I certainly think that there is strong reason for DHHR to pay extremely close attention to this situation. It would make sense to require the father to continue parenting education indefinitely. But I think it is complete overkill to terminate the mother's and the father's parental rights simply because the mother refuses to point an accusing finger to her husband and he will not acknowledge his acts of abuse.

Like the trial judge, I think that the weight of the evidence in this case at this time is that this situation can be salvaged, and the child protected completely—without using the drastic step of terminating parental rights.

Because I don't think it is wise, necessary or legally required to preclude all parents who do not admit or accuse abuse from being parents—and because I think the trial judge made the right call in this particular case—I respectfully dissent.