IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2014 Term

FILED

**February 12, 2014**
released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 13-0362

In Re:  S.W.

Appeal from the Circuit Court of Berkeley County
The Honorable Michael D. Lorensen, Judge
Case No. 12-JA-6

REVERSED AND REMANDED WITH DIRECTIONS

Submitted:  January 15, 2014
Filed:  February 12, 2014

Patrick Morrisey, Esq.
Attorney General
Melinda C. Dugas, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for Petitioner DHHR

Anne B. Prentice, Esq.
Buck & Prentice, PLLC
Martinsburg, West Virginia
Counsel for Respondent Father

William Prentice Young, Esq.
Shepherdstown, West Virginia
Guardian *ad Litem* for S.W.

Stephanie E. Scales-Sherrin, Esq.
Scales Law Office
Martinsburg, West Virginia
Counsel for Non-Offending
Respondent Mother

The Opinion of the Court was delivered PER CURIAM.

SYLLABUS BY THE COURT

1.     "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety."   Syl. Pt. 1, *In re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

2.     "Although parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." Syl. Pt. 3, *In re Katie S.*, 198 W. Va. 79, 479 S.E.2d 589 (1996).

3.     "In a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided." Syl. Pt. 2, *State ex rel. Lipscomb v. Joplin*, 131 W. Va. 302, 47 S.E.2d 221 (1948).

i

4.	"""'Termination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, W.Va. Code, 49-6-5 [1977] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under W.Va. Code, 49-6-5b [1977] that conditions of neglect or abuse can be substantially corrected.' Syllabus Point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980)." Syllabus point 4, *In re Jonathan P.*, 182 W.Va. 302, 387 S.E.2d 537 (1989).' Syl. Pt. 1, *In re Jeffrey R.L.*, 190 W.Va. 24, 435 S.E.2d 162 (1993)." Syl. Pt. 6, *In re Isaiah A.*, 228 W.Va. 176, 718 S.E.2d 775 (2010).

**Per Curiam:**

This case is before the Court upon the appeal of the final order of the Circuit Court of Berkeley County, West Virginia, entered on March 12, 2013. This is a child abuse and neglect matter brought against Respondent Father John W. [1] concerning his infant daughter, S.W. In this appeal, the West Virginia Department of Health and Human Resources ("DHHR") and the guardian ad litem on behalf of S.W. contend that the circuit court erred by directing the DHHR to develop a plan for reunification between the child and father. The non-offending Respondent Mother Jamie W. filed a brief in support of the circuit court's ruling.

Upon careful review of the briefs, the appendix record, the arguments of the parties, and the applicable legal authority, we find that the circuit court erred in ordering reunification. We reach this conclusion in view of the fact that John W. and Jamie W.'s first child, L.W., died due to abusive head trauma in 2009. John W. confessed to causing L.W.'s death and pleaded guilty to felony manslaughter. In spite of the medical evidence to the contrary and his guilty plea, John W. now denies that any abuse or neglect of L.W. occurred. We find that his failure to acknowledge responsibility for the death of L.W. renders the conditions and circumstances in the home untreatable. Therefore, we reverse

---

[1] We follow our past practice in juvenile and domestic relations cases which involve sensitive facts and do not utilize the last names of the parties. *See*, *e.g.*, *W.Va. Dept. of Human Servs. v. La Rea Ann C.L.*, 175 W.Va. 330, 332 S.E.2d 632 (1985).

and remand this case to the circuit court for the entry of an order terminating the parental rights of John W.

## I.  FACTUAL AND PROCEDURAL HISTORY

### A. Birth and Death of L.W.

John W. and Jamie W.'s first child, L.W., was born in December of 2008, at Harbor Hospital in Baltimore City, Maryland. The baby was premature and weighed three pounds eleven ounces at birth. L.W. was in the hospital several days after her birth. She was readmitted for low body temperature, and released six days later.

On the evening of January 9, 2009, John W. and Jamie W. transported L.W. to the Baltimore Washington Medical Center emergency room because her body temperature dropped. The parents reported to hospital personnel that they heard the baby make a "weird cry," and when they went into her room they found her cold and unresponsive. Upon examination, the baby "looked pale and droopy" and the medical providers initially thought that she was possibly suffering from an infection or meningitis. A spinal tap revealed blood which was a sign of a possible brain bleed. A physician then took both parents into a consultation room to tell them of her concerns and asked if the baby had any falls or if she had been thrown in the air or shaken. John W. admitted that he had thrown the baby in the air "playfully." When John W. stated that he had thrown the baby in the air, Jamie W. said, "I told you that you shouldn't do that."

John W. replied, "but she likes that." The physician noticed that after John W. conceded that he had thrown the baby in the air, he looked as if he was going to cry.

A CT scan confirmed that L.W. had internal bleeding and swelling of her brain. She also had bilateral retinal hemorrhaging. These injuries were consistent with the baby being shaken severely.[2] The medical center intubated L.W. to assist with her breathing and then transferred her to Johns Hopkins Hospital due to the severity of her injuries. L.W.'s condition deteriorated rapidly. The physicians at the pediatric intensive care unit at Johns Hopkins Hospital pronounced L.W. brain dead on January 13, 2009. She was kept alive until the evening of January 14, 2009, for organ donation purposes. The death certificate listed the cause of L.W.'s death as abusive head trauma.

Zabiullah Ali, M.D., Assistant Medical Examiner for the State of Maryland, performed an autopsy on the body of L.W. and concluded that

> [t]his 1 month, 7 day old, African American female, **[L.W.]**, died of **HEAD INJURIES.** Investigation indicates that L[.] was brought to the hospital with decreased mental status and

---

[2] The neurological damage caused by shaking is commonly referred to as shaken baby syndrome. The diagnostic triad of symptoms includes retinal bleeding, bleeding in the protective layer of the brain, and brain swelling. *See generally* Comm. on Child Abuse and Neglect, Am. Acad. of Pediatrics, Shaken Baby Syndrome: Rotational Cranial Injuries – Technical Report, 108 *Pediatrics* 206 (2001). "Playfully tossing a child in the air and catching him or her does not cause this type of brain injury, neither does normal 'wear and tear' activity." Roger W. Byard, *Sudden Death in Infancy, Childhood, and Adolescence* 77-163, at 94 (2d ed. 2004)(Cambridge, UK: Cambridge University Press).

a change in her cry. Autopsy examination revealed subdural hemorrhages (bleeding around the brain) with microscopic evidence of early stages of organization, diffuse subarachnoid hemorrhage, widespread hemorrhagic infarcts of the brain and upper spinal cord, global hypoxic-ischemic changes, and left retinal hemorrhages with bilateral optic nerve sheath hemorrhage. Review of the medical record indicates L[.] had extensive subarachnoid and subdural hemorrhage, left retinal hemorrhages, and cerebral edema with midline shift. Thrombosis of the superior sagittal sinus seen at autopsy is a complication of global ischemic/hypoxic brain damage. The manner of death is **HOMICIDE.** (emphasis in original).

### B. John W.'s Confession, Guilty Plea and Manslaughter Conviction

On January 11, 2009, Detective J.S. Gajda with the Anne Arundel County Maryland's Criminal Investigation Division, Homicide Unit, questioned John W. about the circumstances surrounding L.W.'s injuries. John W. stated that the baby starting "fussing" and she would not stop, so he "bounced her." When the baby would not stop crying, he "bounced her a little more." John W. then said that he "probably" bounced L.W. "too hard." He told the detective that he regretted his actions and explained that he was having "a bad day."

The detective asked John W. if he wanted to write a letter of apology to L.W., and John W. prepared the following handwritten note:

[L.], I am so sorry for what I did to [you] when [you] were still a[n] infant[.] I had a bad day and I guess I don't know my own strength and I guess I shook [you] a little to[o] hard and [you] ended up in the hospital with brain injuries[.] I'm so sorry.

4

Thereafter, John W. was arrested and indicted by a grand jury, sitting for the State of Maryland in Anne Arundel County, on charges of: (1) second degree murder; (2) child abuse in the first degree causing death; (3) manslaughter;[3] (4) child abuse in the first degree causing physical injury; (5) child abuse in the second degree; and (6) reckless endangerment. On August 24, 2009, John W. pleaded guilty to manslaughter.[4]

We note that Maryland does not differentiate between voluntary and involuntary manslaughter in its statute. Maryland Criminal Law § 2-207 (2002) states, in part: "(a) A person who commits manslaughter is guilty of a felony and on conviction is subject to: (1) imprisonment not exceeding 10 years; or (2) imprisonment in a local correctional facility not exceeding 2 years or a fine not exceeding $500 or both." In *Cox v. State*, 518 A.2d 132 (Md. Ct. Spec. App. 1986), the Maryland Court of Appeals provided the following definitions of manslaughter: "Voluntary manslaughter has been defined as 'an intentional homicide done in sudden passion or heat of blood caused by reasonable provocation, and not with malice aforethought. . . .' Involuntary manslaughter, on the other hand, has been defined as 'the killing of another unintentionally and without malice[.]'" *Id.* at 135 (citations omitted).

---

[3] In Count Three of the Indictment, the grand jury charged that John W. "feloniously, without malice aforethought, kill[ed] and slay[ed] [L.W.]."

[4] John W. did not go through a colloquy with the court when he made this plea.

Following the manslaughter conviction, the Maryland court sentenced John W. to serve six years in the penitentiary, and suspended all but eighteen months. John W. served nine months in the penitentiary following his guilty plea.[5]

### C. Abuse and Neglect Proceedings Following the Birth of S.W.

The instant case involves the abuse and neglect proceedings for John W. and Jamie W.'s daughter, S.W., who was born in February of 2012, at Winchester Medical Center in Winchester, Virginia. The DHHR received a referral from the hospital following S.W.'s birth after Jamie W. told the hospital staff that the couple had another child in 2008 that died. Jamie W. reported to hospital staff that her husband, John W., served a jail sentence for the death of the child but that she did not believe he hurt their child.

The DHHR filed an abuse and neglect petition against John W. and Jamie W. on February 10, 2012, pursuant to West Virginia Code § 49-6-5b(a)(3) (2009), alleging that John W. was subject to an aggravated circumstances filing based upon his conviction of manslaughter following the death of S.W.'s sibling.[6] On that same day, the

---

[5] Following John W.'s release from prison, the couple moved to Berkeley County, West Virginia.

[6] West Virginia Code § 49-6-5b states, in part:

(continued . . .)

circuit court granted emergency custody of S.W. to the DHHR. The DHHR completed a

family functioning assessment, applicable to both parents. The case worker noted that

John W.

> was convicted of the death of his daughter two years ago. He spent 9 months in jail and is now on unsupervised probation. John denies hurting his daughter and reports confessing because he does not handle conflict well and due to his ADHD he just wanted to be done with interrogation. . . .
>
> John's inability to control his anger when his child was crying is of great concern to the worker. He is unable to control his actions resulting in an inability to parent safely.

The case worker made the following observations about Jamie W.:

> After her first daughter was admitted to the hospital and was in a coma, she only visited for short periods of time. In the case records from MD it was reported that on one occasion Jamie visited for five minutes[.] [T]hey reported she was going to lunch and running errands and that she would return, which she did not until the next evening. The second visit she told the hospital staff she would not be returning to see her daughter at all. The worker from Maryland was the

---

> (a) Except as provided in subsection (b) of this section, the department shall file or join in a petition or otherwise seek a ruling in any pending proceeding to terminate parental rights:
>
> ….
>
> (3) If a court has determined the parent has committed murder or voluntary manslaughter of another of his or her children or the other parent of his or her children; has attempted or conspired to commit such murder or voluntary manslaughter or has been an accessory before or after the fact of either crime; has committed unlawful or malicious wounding resulting in serious bodily injury to the child or to another of his or her children or to the other parent of his or her children; or the parental rights of the parent to a sibling have been terminated involuntarily.

7

last visitor [L.W.] had before she was pronounced dead and the doctor was the only person with her when she was taken off of life support.

Jamie chose to be with her husband instead of in the hospital with their daughter after she was admitted and was in a coma. Her inability to put her child before her own needs is a great concern for a vulnerable infant's safety as well as her refusal in believing her husband's role in her child's death is a major concern for any infant in their care.

The circuit court held a preliminary hearing on March 12, 2012, and an evidentiary hearing on March 26, 2012. The circuit court denied John W.'s motion for visitation and found that visitation would not be consistent with the child's well-being and best interests. The circuit court adopted an agreement between the parties that allowed Jamie W. to have a minimum of two supervised one-hour visitation sessions with S.W. per week, with the DHHR having the discretion to increase the frequency of those visits.

The circuit court conducted an adjudicatory hearing on July 11, 2012. The circuit court found that John W.'s guilty plea and manslaughter conviction for the death of L.W. constituted aggravated circumstances under West Virginia Code § 49-6-5(a)(7)(B) (2009). The circuit court ruled that based upon the conditions existing at the time of the filing of the petition that S.W. was "abused and neglected as defined by West Virginia Code § 49-1-3 [(2009)]." The circuit court ordered that John W. have no contact with S.W., and found that the DHHR was not required to make reasonable efforts to preserve the family with regard to John W.

8

At the adjudicatory hearing, the DHHR and the guardian ad litem for S.W. informed the circuit court that S.W. had been returned to the physical custody of Jamie W. in June of 2012, subject to the terms of a safety plan.[7] Counsel for the DHHR and Jamie W.'s counsel moved that the petition either be dismissed with respect to Jamie W. or that she be considered a non-offending respondent. The guardian ad litem had no objection. Thereafter, the circuit court ruled that Jamie W. was a non-offending respondent.[8] The matter was scheduled for disposition.

The circuit court conducted additional evidentiary hearings in October of 2012, on John W.'s motions for visitation, reunification, or in the alternative, an improvement period. The circuit court heard testimony from John W.'s expert witness, Bernard Lewis, Ph.D., a licensed psychologist. Dr. Lewis conducted a parental capacity evaluation of John W. and opined that John W. was a "very low or absolutely minimal level of risk for harming this child." Dr. Lewis recommended that John W. be reunified into the home with S.W., with supervised visitation at first.

---

[7] During oral argument in this matter, this Court expressed its concerns about the decision to place S.W. with Jamie W. in light of the fact that Jamie W. continued to deny that John W. caused L.W.'s death. The DHHR and the guardian ad litem represented that the child was placed with her mother because Jamie W. showed improvement following her receipt of social services. All parties agree Jamie W. has a strong family support system and that S.W. is doing well in her care.

[8] After careful review of the appendix record submitted to this Court, it does not appear that the circuit court entered an order dismissing the petition against Jamie W.

In his report dated September 17, 2012, Dr. Lewis stated that he relied upon John W.'s history of the death of his first daughter. John W. reported to Dr. Lewis that after L.W. was taken to the emergency room, she was given a spinal tap which he believed caused her to go into a coma and subsequently led to her death. John W. acknowledged to Dr. Lewis that he gave a confession to law enforcement authorities but he adamantly stated he did nothing to harm or cause the death of his first child. John W. stated that his confession occurred after hours of questioning "and being worn down to the point where he was willing to do almost anything to get out of the police station[.]"[9]

In his testimony, Dr. Lewis stated that John W. was "the textbook example of individuals who make false confessions." On cross-examination, Dr. Lewis admitted that he relied upon the DHHR's summaries provided by John W.'s counsel and did not review L.W.'s medical records showing how she died to assess whether John W. was being truthful. Counsel for the DHHR questioned Dr. Lewis as follows:

> Q. [Mr. Rossi] I guess one of the problems I'm having is trying to understand – and maybe you just – maybe your opinion doesn't go there. Trying to understand how, if [John W.] doesn't admit that he did anything wrong with respect to the death of his first child, then how he can remedy himself. How he can prove himself from that time period.
>
> A. [Dr. Lewis] First of all, I'm willing to entertain the possibility that he's right. I understand legally he's not right.

---

[9] The record reflects that, during police questioning, Detective Gajda told John W. that he could leave at any time.

Legally he bears responsibility for that child. I understand that. I accept that. *But I also think, given my understanding of the big picture of the circumstances, I think it's possible that he was right. That he did not bear responsibility for the death of that child. So let's start with that.*

*But moving beyond that and minimizing that, throwing that out, we're four years down the road.* This man has changed in that four years, he has served his time in incarceration for that, he has paid his debt to society for that, he remains on now unsupervised probation for that. So in that sense, you know, he has done what the law required of him. There have been no problems with incarceration. No problems with probation. He's not violated anything. He has not shown himself to in any way be a violent, aggressive, angry, temperamental, substance abusing kind of person who would be at risk.

So if we go back and say, okay, he's not being honest about that, there was something that he did, and there was never any clear evidence of what it was specifically that he did. But if we go back and say he did something, then I think we need to look at the four years since then and what he is like psychologically now. And that to me is the most important factor. (emphasis supplied).

The circuit court also heard testimony from Catherine Smith-Heine, who was qualified as an expert in counseling with an expertise in parenting. She testified that John W. successfully completed eight sessions of parenting class. She also stated that John W. denied harming L.W.

Jamie W. testified in support of John W.'s motion for visitation with L.W. She blamed L.W.'s death on medical professionals. Jamie W. stated that she had "papers" from another doctor indicating that L.W. suffered from a minor contusion "made worse

11

by a spinal tap." When asked to provide that document, Jamie W. stated that she had it "at home."

Several family members testified in support of John W.'s motion for visitation. Angela Agostini, Jamie W.'s mother and S.W.'s grandmother, testified that she believes it is important for S.W. to have contact with her father. Ms. Agostini stated that she has never known John W. to be a violent or aggressive person. On cross-examination, Ms. Agostini was asked if John W. ever admitted to killing L.W. She answered in the negative, indicating "It's not something we discussed."

John W. testified and requested that the circuit court grant him visitation with S.W. John W. stated that he would be willing to engage in parenting classes and work with the DHHR if he were granted an improvement period. He denied doing anything to intentionally harm L.W. On cross-examination, John W. was shown a copy of the apology letter he wrote to L.W., and he stated, "I really didn't remember writing that." He admitted that he pleaded guilty to manslaughter following the death of L.W. When asked if he was telling the truth, that he committed manslaughter, John W. replied, "Yes." He also agreed that during the police interrogation, the detective told him he was free to go at any time.

Following this testimony, the circuit court found that it was in S.W.'s best interest to deny John W.'s motions for visitation, reunification or an improvement period.

The circuit court set the case for disposition again.[10] At the disposition hearing held on February 27, 2013, Jamie W. and other family members testified in support of John W.'s previous motions for visitation, reunification or for an improvement period.

The circuit court entered a disposition order on March 13, 2013, and found that "because there has been no showing of present unfitness . . . less drastic alternative[s] may be available in this matter, and failure to implement such in a safe manner, will cause further harm to this child[.]" The circuit court directed the DHHR to "prepare a plan of reunification which contemplates supervised visitation with a plan to move toward unsupervised visitation and ultimately re-unification without government involvement."[11] This appeal followed.[12]

## II. STANDARD OF REVIEW

This Court has explained that "[f]or appeals resulting from abuse and neglect proceedings, such as the case *sub judice*, we employ a compound standard of

---

[10] On December 21, 2012, the circuit court held a status conference and noted that the case was going to be transferred to another judge. The parties agreed that transcripts of prior hearings would be provided to the judge to review before the final dispositional hearing was conducted.

[11] The circuit court did not dismiss the petition against John W., order a dispositional improvement period, or articulate its disposition of this case in accordance with the provisions of West Virginia Code § 49-6-5 (2009) and Rule 36 of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings.

[12] The circuit court entered a stay of execution of this order pending the outcome of this appeal.

13

review: conclusions of law are subject to a *de novo* review, while findings of fact are weighed against a clearly erroneous standard." *In re Emily*, 208 W.Va. 325, 332, 540 S.E.2d 542, 549 (2000). In addition, we have held:

> Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

Syl. Pt. 1, *In re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996). With these principles in mind, we turn to the parties' arguments.

### III. DISCUSSION

As a preliminary matter, this Court notes that the legal framework for deciding parental termination petitions is well established. The proceedings consist of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the circuit court must determine whether one or more of the statutory grounds for termination of parental rights exists by clear and convincing evidence. If the circuit court determines that a statutory ground for termination exists, then it proceeds to the

14

dispositional phase. During the dispositional phase, the circuit court must determine the appropriate outcome of the case considering the best interests of the child.[13]

In this case, the circuit court conducted an adjudicatory hearing on July 11, 2012. At this hearing, the circuit court ruled that John W.'s prior guilty plea and conviction for the death of his child, L.W., constituted aggravated circumstances, under West Virginia Code § 49-6-5(a)(7)(B). Therefore, the DHHR was not required to make reasonable efforts to preserve the family with regard to John W. The circuit court found that S.W. was an abused and neglected child as those terms are defined under West Virginia Code § 49-1-3.[14] John W.'s counsel objected to this finding. The circuit court overruled the objection and scheduled the matter for a disposition hearing. The circuit court stated that "the only remaining issue for the court's determination will be whether [John W.] can show a change of circumstances sufficient to be granted an improvement period."

---

[13] *See* Syl. Pt. 2, *W.Va. Dept. of Health & Human Res. ex rel. Wright v. Brenda C.*, 197 W.Va. 468, 475 S.E.2d 560 (1996) ("'In a child abuse and neglect hearing, before a court can begin to make any of the dispositional alternatives under W. Va. Code, 49–6–5, it must hold a hearing under W. Va. Code, 49–6–2, and determine "whether such child is abused or neglected." Such a finding is a prerequisite to further continuation of the case.' Syl. Pt. 1, *State v. T.C.,* 172 W.Va. 47, 303 S.E.2d 685 (1983).").

[14] The circuit court did not enter its order following the adjudicatory hearing until October 20, 2012, well outside the time frame set forth in the rules. Rule 27 of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings provides that at the conclusion of the adjudicatory hearing, "*[t]he court shall enter an order of adjudication . . . within ten (10) days of the conclusion of the hearing[.]*" *Id.* (emphasis supplied).

On appeal to this Court, the DHHR and the guardian ad litem do not dispute the circuit court's adjudicatory findings.[15] Therefore, the fundamental issue before this Court is whether the circuit court erred in the disposition of this case. The DHHR and the guardian ad litem contend that the circuit court abused its discretion following the disposition hearings when it overturned previous rulings denying an improvement period, denying reunification and denying visitation. The DHHR and the guardian ad litem argue that the only clear option under the law was termination of parental rights. Although John W. confessed to causing the death of L.W. and pleaded guilty to manslaughter, he now denies that any abuse or neglect of L.W. occurred. Therefore, the DHHR and the guardian ad litem maintain there is no reasonable likelihood that the conditions of abuse can be substantially corrected because John W. fails to acknowledge that abuse of L.W. occurred, in spite of the clear medical evidence to the contrary. In response, John W. argues that the circuit court did not err in ordering reunification with S.W. because there has been no present showing of unfitness. He contends that his previous manslaughter conviction in another state cannot shift the burden to him to prove present fitness.

---

[15] In his brief, John W. criticized the circuit court's finding following the adjudicatory phase of this case. He argued that the Maryland manslaughter conviction should not be equated to a voluntary manslaughter conviction under the West Virginia Code to reach the aggravated circumstances finding. However, John W. did not cross-assign as error the circuit court's adjudication of this case and that issue is not before this Court. We further note that the circuit court did not reverse its adjudication.

16

In determining the appropriate disposition of an abuse and neglect proceeding, we acknowledge that "[a]lthough parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children.' Syllabus Point 3, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996)." Syl. Pt. 1, *In re: Tonjia M.*, 212 W.Va. 443, 573 S.E.2d 354 (2002). In other words, "'[i]n a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided." Syl. Pt. 1, *State ex rel. Cash v. Lively*, 155 W.Va. 801, 187 S.E.2d 601 (1972)." Syl. Pt. 4, *State ex rel. David Allen B. v. Sommerville*, 194 W.Va. 86, 459 S.E.2d 363 (1995).

As noted above, the DHHR was required to file a petition seeking termination of parental rights in this case pursuant to West Virginia Code § 49-6-5b. Pursuant to our statutes, the DHHR was *not* required to make reasonable efforts to preserve the family considering the fact that John W. pleaded guilty to manslaughter of a previous child. W.Va. Code § 49-6-5(a)(7)(B)(ii) .

"Although the requirement that such a petition be filed does not mandate termination in all circumstances, the legislature has reduced the minimum threshold of evidence necessary for termination where one of the factors outlined in West Virginia Code § 49-6-5b(a) (1998) is present." Syl. Pt. 2, in part, *In re George Glen B. Jr.*, 205 W.Va. 435, 518 S.E.2d 863 (1999). Moreover, termination is proper when "there is no reasonable likelihood that the conditions of neglect or abuse can be substantially

17

corrected in the near future and, when necessary for the welfare of the child . . . ." W.Va. Code § 49-6-5(a)(6). In such cases, the lower court must allow the development of evidence surrounding the prior abuse and determine "what actions, if any, the parent(s) have taken to remedy [those] circumstances[.]" Syl. Pt. 4, in part, *In re George Glen B. Jr.*, 205 W.Va. 435, 518 S.E.2d 863.

Having carefully examined the extensive record and testimony in this case, this Court is of the opinion that the circuit court committed reversible error in ordering that S.W. be reunited with John W. when the overwhelming evidence supported the termination of his parental rights. We reach this conclusion in view of clear and convincing proof that the injuries to L.W. were, in fact, consistent with abusive head trauma. Her death was ruled a homicide by medical examiners. John W. admitted to throwing this infant in the air and bouncing her when she would not stop crying. John W.'s explanations to the contrary throughout these proceedings were completely contradictory to the medical evidence. This Court has consistently articulated and adhered to the statutorily-mandated standard for the termination of parental rights. West Virginia Code § 49-6-5(a)(6) authorizes the termination of parental rights "[u]pon a finding that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future and, when necessary for the welfare of the child."

18

We emphasize that this case involves the death of a child. Contrary to Dr. Lewis' suggestion, this Court cannot minimize or disregard the death of L.W. The risk in this kind of case is evident and, consequently, any chance of subjecting the current living child to circumstances that could result in a similar fate is unacceptable. The evidence in this case unequivocally shows that John W. inflicted the fatal neurological injuries suffered by L.W. Despite his confession and guilty plea to manslaughter, he failed to take responsibility for his actions during these proceedings. He maintained that her injuries were caused by mistakes made by hospital personnel. This explanation wholly lacked support from the record evidence and is inconsistent with the medical records and autopsy of the child.[16] As this Court has noted, a parent's denial of abuse or neglect in the face of unrefuted medical evidence reflects an underlying resistance to the treatment needed to effect the behavior changes that will ensure a child's safety. *See In re Kaitlyn P.*, 225 W.Va. 123, 127, 690 S.E.2d 131, 135 (2010) (finding that where child was clearly

---

[16] This Court is cognizant of the fact that there is controversy in the legal and medical communities regarding criminal convictions of murder based solely on the presence of the diagnostic triad associated with shaken baby syndrome: retinal bleeding, bleeding in the protective layer of the brain, and brain swelling. *See* Deborah Tuerkheimer, *Science-Dependent Prosecution and the Problem of Epistemic Contingency: A Study of Shaken Baby Syndrome*, 62 Ala. L. Rev. 513, 515 (2011) (discussing lack of consensus that the diagnostic triad is necessarily and exclusively induced by shaking and recognizing that other medical disorders and accidental trauma can cause symptoms previously associated with shaken baby syndrome). This controversy does not affect the outcome of the case *sub judice*. The diagnosis in this case was abusive head trauma, not shaken baby syndrome. By definition, abusive head trauma is head trauma that is inflicted. The record also demonstrates that John W. gave a police confession and pleaded guilty to felony manslaughter. He did not challenge this plea in an appeal or file a post-conviction habeas corpus petition.

19

abused and his siblings were certainly at risk of being abused, parents were not entitled to post-adjudicatory improvement period when they failed to even acknowledge that abuse occurred, despite uncontroverted medical evidence to the contrary).

Accordingly, we find that termination of John W.'s parental rights in the present proceeding is warranted. We believe that the DHHR proved that S.W. remains at substantial risk of significant harm from John W. There was no showing of a reasonable likelihood that the conditions of abuse can be substantially corrected because John W. has failed to acknowledge that abuse caused the death of L.W. As we have previously explained:

> """Termination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, W.Va. Code, 49-6-5 [1977] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under W.Va. Code, 49-6-5(b) [1977] that conditions of neglect or abuse can be substantially corrected." Syllabus Point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).' Syllabus point 4, *In re Jonathan P.*, 1982 W.Va. 302, 387 S.E.2d 537 (1989)." Syl. Pt. 1, *In re Jeffrey R.L.*, 190 W.Va. 24, 435 S.E.2d 162 (1993).

Syl. Pt. 6, *In re Isaiah A.*, 228 W.Va. 176, 718 S.E.2d 775 (2010).

Without question, the precedent of this Court supports our holding. In *West Virginia Department of Health and Human Resources ex rel. v. Doris S.*, 197 W.Va. 489, 475 S.E.2d 865 (1996), we affirmed termination of parental rights after a child in the

20

home suffered fatal injuries and the autopsy results showed a severe injury to the spinal column consistent with violent shaking. This Court stated that

> in order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.

197 W.Va. at 498, 475 S.E.2d at 874 (footnote omitted); *see also Matter of Taylor B.*, 201 W.Va. 60, 69, 491 S.E.2d 607, 616 (1997) (finding termination of parental rights appropriate disposition when neither parent ever acknowledged that any abuse or neglect occurred despite medical evidence that child's injuries were consistent with shaken baby syndrome, a life-threatening circumstance).

The facts surrounding the death of L.W. are very disturbing. This Court declines to rule in any way that might risk the life of another child whose parent has engaged in such horrific conduct. We again acknowledge that parental rights are fundamental in nature, but we conclude that the DHHR not only established a statutory basis for termination of John W.'s parental rights, but also proved that termination was the least restrictive means of protecting S.W. under the facts of this case.

Finally, this Court remains deeply concerned that the disposition in this case raises a critical issue not resolved below: Whether Jamie W. is committed to ensuring that John W. will have no contact with S.W. Simply stated, will Jamie W. place

21

the safety of her daughter above the desires of her husband? As noted by the initial case worker, Jamie W. refused to believe her husband had any role in L.W.'s death. In our review of the record, we find that Jamie W.'s opinion has not changed and she continues to support John W. This Court cannot abandon the question of this child's well-being without further inquiry into this situation. We therefore find that the DHHR must continue to monitor the status of this case to reasonably assure the safety of S.W.[17] *See In re Brianna Elizabeth M.*, 192 W.Va. 363, 367, 452 S.E.2d 454, 4589 (1994)("Although sound public policy and the whole tenor of law seek generally to perpetuate the marital bond, the rights of children to be free from abuse require that a parent's first loyalty be to the protection of his or her children."). This matter will be remanded to the circuit court for further proceedings with the assistance of the DHHR to determine whether such protection is being accorded. As part of these reviews, the circuit court should also examine whether any additional services are required.

## IV. CONCLUSION

Based upon the foregoing, the final order of the Circuit Court of Berkeley County entered March 12, 2013, is reversed, and this case is remanded for the entry of an order (1) terminating the parental rights of John W. to S.W., and (2) directing the DHHR to develop a plan to monitor S.W.'s safety.

---

[17] *See supra* note 8.

Reversed and remanded with directions.