# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

*In re* B.F.

No. 19-0825 (Marion County 18-JA-91)

**FILED**
**April 28, 2020**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioners D.M. and J.F., intervenors below and the child's maternal grandparents, by counsel Neal Jay Hamilton, appeal the Circuit Court of Marion County's August 19, 2019, order denying them permanent placement of B.F.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel S.L. Evans, filed a response in support of the circuit court's order. The guardian ad litem, Clarissa M. Banks, filed a response on behalf of the child in support of the circuit court's order. Petitioners filed a reply. On appeal, petitioners argue that the circuit court erred in denying their motion for placement of the child upon erroneous findings and evidence insufficient to overcome the preference for placement with grandparents set forth in West Virginia Code § 49-4-114.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In June of 2018, the DHHR filed a petition that alleged that the West Virginia State Police contacted the DHHR with information that the child's mother posted to social media a video

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

1

depicting her performing oral sex on four-month-old B.F.[2] The mother was eventually arrested for this conduct. According to the petition, petitioners initially requested to be considered for placement of the child "with the understanding that [the mother] would not be permitted to be at the residence." Despite the fact that the DHHR asserted that petitioners "appear[ed] appropriate and their home was clean and safe," the DHHR indicated that it could not place B.F. in their home because the mother "resid[ed] in the home and the incident [of sexual abuse] occur[ed] in their home." According to the record, the mother lived with petitioners for "more than five years." The DHHR further indicated that while gathering information for petitioners' home study, petitioner grandmother "reported [that she had] a prior felony" conviction stemming from an incident in which she stole a prescription pad from the doctor's office where she worked to write herself prescriptions. Further, Child Protective Services ("CPS") "discovered substantiated maltreatment" by petitioner grandmother in a prior investigation during which she left her own children unsupervised. As such, the DHHR indicated that petitioners' home study could "not be approved[,] which prevents the Department from agreeing to place the child with" petitioners. Upon removal, B.F. was placed in foster care.[3] In July of 2018, B.F. was placed in his current foster home, where he remained throughout the proceedings.

In October of 2018, petitioners moved to intervene in the proceedings, which motion was eventually granted. In November of 2018, the mother was adjudicated as an abusing parent and she voluntarily relinquished her parental rights to the child. At that time, the circuit court ordered that the mother have "no post-termination contact" with the child.

Thereafter, the circuit court held hearings on the child's permanent placement in April of 2019 and July of 2019. During the hearings, petitioners presented three witnesses who testified on their behalf, including B.F.'s aunt, petitioner grandfather's brother, and a family friend. According to the dispositional order, the child's aunt "testified that she was aware of [the mother's] substance abuse issues." Petitioners also testified. The record shows that by this time, petitioner grandmother had participated in grievance proceedings with the DHHR regarding the issues of her prior substantiated CPS involvement and criminal conviction. According to the circuit court, the result of these proceedings were that "both issues were waived and [petitioners] obtained an approved home study by the . . . DHHR." Despite this waiver, the court found that petitioner grandmother "has an admitted history of drug abuse issues." Additionally, the circuit court found that during the course of the proceedings, the child's sibling, B.K., "made disclosures to his stepmom . . . and to his counselor . . . regarding sexual abuse by his mother," and that B.K. informed his stepmother "that he attempted to tell [petitioner grandmother] about the sexual abuse, but he was ignored." B.K.'s counselor further indicated that B.K. did not wish to have visitation with petitioners because

---

[2]Although not alleged in the initial petition, it was later established that upon B.F.'s birth, he remained hospitalized due to withdrawal symptoms from being born drug-exposed. According to petitioner grandmother's testimony, the mother was prescribed Subutex "[a]nd her doctor told her to stay on it during her pregnancy."

[3]The mother had another child, B.K., who was also removed from her legal and physical custody. Petitioners did not seek custody of B.K. below. Accordingly, the child's status is not at issue on appeal. The mother eventually voluntarily relinquished her parental rights to that child as well, and the permanency plan for the child is to remain with the nonabusing father.

he had "a lot of anger toward them." Petitioner grandmother "testified she does not believe the later disclosures of B.K. regarding sexual abuse by his mother."

Further, the circuit court found that petitioners "have always been protective of their daughter . . . and in the past have repeatedly denied her blatant drug abuse issues." Additionally, petitioner grandfather "immediately posted [the mother's] bond" following her arrest for sexual abuse and "continue[d] to pay her bond" up through the date of the final hearing in this matter. The circuit court further found that, at the time of the final hearings, the mother resided at her grandmother's home, "which is within a few minutes of [petitioners'] home." Both petitioners admitted that they still have contact with the mother.

The circuit court made further findings regarding B.K.'s father's attempts to have petitioners "get [the mother] help for her substance abuse issues," but petitioners "refused to intervene." As a result, the circuit court found that "[t]here has been an irrevocable breakdown in the relationship between B.K.'s biological father . . . and [petitioners]; therefore, sibling visits between B.K. and . . . B.F. would not continue" if petitioners obtained custody of B.F. This is in spite of the fact that sibling visits occurred regularly during the proceedings and the infants were "very bonded and it would be detrimental to both if the visits were to end."

Ultimately, the circuit court found that petitioners "failed to protect their grandchildren including . . . B.F. from [the mother's] negative influences, namely her substance abuse and the sexual abuse." Further, the circuit court found that petitioners "maintain a relationship with [the mother] and that due to this relationship and the close proximity of [the mother]'s residence, it would be impossible for [petitioners] to maintain the order of no contact between . . . B.F. and" the mother. As such, the circuit court concluded that placing B.F. in petitioners' care would not be in the child's best interests. This was especially true considering that B.F. was "thriving in his . . . foster home and . . . bonded with his foster parents, . . . referring to them as mom and dad." It is from the dispositional order that petitioner appeals.[4]

The Court has previously established the following standard of review:

"Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

---

[4]The child's parents' parental rights have been terminated. According to the parties, the permanency plan for the child is adoption in the current foster home.

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

This case turns entirely upon the circuit court's application of the statutory requirement that the DHHR offer a child's grandparents placement of that child in certain circumstances. According to that statute, West Virginia Code § 49-4-114,

> [f]or purposes of any placement of a child for adoption by the department, the department shall first consider the suitability and willingness of any known grandparent or grandparents to adopt the child. Once grandparents who are interested in adopting the child have been identified, the department shall conduct a home study evaluation, including home visits and individual interviews by a licensed social worker. If the department determines, based on the home study evaluation, that the grandparents would be suitable adoptive parents, it shall assure that the grandparents are offered the placement of the child prior to the consideration of any other prospective adoptive parents.

The record shows that the DHHR complied with this requirement from the outset of the proceedings. As evidenced by the initial abuse and neglect petition, the DHHR had identified petitioners as a potential placement for the child prior to filing the petition. However, the petition also indicates that the DHHR was aware that petitioners would be unable to pass their home study for a variety of reasons, including the fact that the abusing mother lived in the home at that time and petitioner grandmother's criminal conviction and past substantiated CPS issues. As the statute above clearly contemplates, the DHHR is only required to offer placement of the child if it determines through a home study that such grandparents are suitable. Given the uncontested fact that petitioners could not pass their home study at the time the child was initially removed, we find that the DHHR appropriately sought a different foster placement for the child.

As to the circuit court's ultimate decision to deny petitioners permanent placement of the child, we similarly find no error. Central to petitioners' argument on appeal is that they eventually passed their home study and, thus, were entitled to placement of the child pursuant to the grandparent preference. In essence, they claim that because they have been approved as foster care/adoptive parents for any other child, the court erred in determining that they were not a proper permanent placement option for the child in this case.

We do not agree. In addressing the grandparent preference, this Court has held as follows:

> "West Virginia Code § [49-4-114] provides for grandparent preference in determining adoptive placement for a child where parental rights have been terminated and also incorporates a best interests analysis within that determination by including the requirement that the DHHR find that the grandparents would be suitable adoptive parents prior to granting custody to the grandparents. The statute contemplates that placement with grandparents is presumptively in the best interests of the child, and the preference for grandparent placement may be overcome only where the record reviewed in its entirety establishes that such

4

placement is not in the best interests of the child." Syllabus point 4, *Napoleon S. v. Walker*, 217 W.Va. 254, 617 S.E.2d 801 (2005).

Syl. Pt. 2, *In re Elizabeth F.*, 225 W. Va. 780, 696 S.E.2d 296 (2010). Although passage of a home study is certainly a predicate to placement with a child's grandparents, petitioners' argument ignores the discretion afforded circuit courts in making a determination as to the child's best interest in ordering permanent placement, a second necessary component in considering the grandparent preference.

Indeed, this Court has long held that "'[i]n a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided.' Syl. Pt. 2, *State ex rel. Lipscomb v. Joplin*, 131 W.Va. 302, 47 S.E.2d 221 (1948)." Syl. Pt. 3, *In re S.W.*, 233 W. Va. 91, 755 S.E.2d 8 (2014). Under *Elizabeth F.* quoted above, the circuit court, after having been presented with an approved home study, is required to make a determination as to whether placement with a grandparent would be in the child's best interests based on the entirety of the evidence, not just the approved home study. In this case, the circuit court recognized that petitioners were able to obtain a favorable home study from the DHHR after challenging the issues that initially disqualified them, but after considering the entire record, as it was required to do, permissibly and properly concluded that placement with petitioners would not be in the child's best interest.

In further support of their appeal, however, petitioners challenge many of the circuit court's findings made in determining that they were not a proper placement. But these challenges seek nothing more than a reassessment of credibility issues, which this Court will not undertake. *See Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997) ("A reviewing court cannot assess witness credibility through a record. The trier of fact is uniquely situated to make such determinations and this Court is not in a position to, and will not, second guess such determinations."). For example, petitioners address, at length, the evidence below regarding whether they had a continued relationship with the mother or would permit her to have continued contact with the child in violation of the court's order due. Petitioners cite their own testimony wherein they unequivocally stated that they would not permit such contact. However, the circuit court further considered evidence of their past actions, such as how they have always protected the mother and failed to acknowledge her substance abuse issues, coupled with the fact that they continued to pay her bond and lived in close proximity to her new residence. In fact, in their brief on appeal, petitioners admit that "there was evidence of occasional communication" between them and the mother, but assert that "there was no evidence presented of any continued relationship" between them. This argument over semantics—whether "communication" between two parents and their daughter constitutes a "relationship"—is insufficient to disturb the circuit court's findings on appeal. Petitioners' brief on appeal is replete with such arguments attacking the circuit court's credibility determinations. As such, it is incorrect to say that there was insufficient evidence to support the circuit court's findings below. Rather, petitioners simply disagree with the circuit court's conclusions based on their own interpretation of the evidence.

Petitioners also take issue with the circuit court's finding that they "failed to protect their grandchildren including . . . B.F." from the mother's "negative influences, namely her substance abuse and the sexual abuse." According to petitioners, "there was no evidence that [they] were

either guilty of any neglectful conduct themselves, nor aware of, or permitted, any abusive or neglectful conduct" by the mother. This argument ignores the fact that the conduct giving rise to the petition against the mother took place in their home. The circuit court's finding that they failed to protect the children does not require their explicit approval of the mother's conduct or even their knowledge that it occurred. The fact remains that B.F. was sexually abused in their home and they failed to prevent this abuse; knowingly or otherwise, petitioners permitted the mother to subject the child to her "negative influence," as the circuit court correctly found.

Another challenge to the circuit court's findings concerns references to the mother's abuse of "controlled substances." Petitioners assert that "there is nothing in the record to indicate that [the mother's] Subutex was not prescribed, nor that she was taking any non-prescribed controlled substances or drugs at the time of committing the sexual abuse of B.F." This argument, however, not only ignores the specific evidence admitted below but also the realities of the mother's Subutex use. Importantly, the circuit court found that one of petitioners' witnesses, B.F.'s aunt, "testified that she was aware of [the mother's] substance abuse issues." Further, Subutex is a drug used for the treatment of opioid dependence, which, by its very nature, reveals that the mother had a substance abuse problem. The record also shows that CPS conducted a prior investigation into the mother's substance abuse while residing in petitioners' home, during which petitioners were "very protective of their daughter." Regardless of whether CPS was able to substantiate the claims of substance abuse during that prior investigation, it is clear that petitioners either were or should have been aware of the possibility that the mother abused drugs and that they needed to take steps to protect the child living in their home.

Finally, petitioners take issue with the court's findings regarding B.K.'s disclosures of sexual abuse by the mother and his report of this abuse to petitioner grandmother. In attacking these findings, petitioners point out that it was B.K.'s father and stepmother who alleged that B.K. disclosed sexual abuse to petitioner grandmother, while it is undisputed that B.K. did not make such disclosures during his interview at a Child Advocacy Center. Moreover, petitioners recount that B.K.'s therapist indicated that the child's disclosures were not of sexual abuse, but of uncomfortable hugging and touching of his leg, and the therapist testified that the child did not say he ever told petitioners about these issues. Petitioners also attack B.K.'s father's testimony, given that he was previously convicted of the felony offense of falsifying documents. Again, petitioners fail to recognize that this is an issue of credibility, and this Court declines to disturb the findings on appeal because the record shows that there was evidence that B.K. made these disclosures and notified petitioner grandmother. In short, these findings were not clearly erroneous. Ultimately, we find that the denial of placement with petitioners was based upon sufficient evidence to overcome the statutory preference for placement with grandparents because it was clearly not in the child's best interests.

For the foregoing reasons, we find no error in the decision of the circuit court, and its August 19, 2019, order is hereby affirmed.

Affirmed.

**ISSUED**:  April 28, 2020


**CONCURRED IN BY**:

Chief Justice Tim Armstead
Justice Margaret L. Workman
Justice Elizabeth D. Walker
Justice Evan H. Jenkins
Justice John A. Hutchison

7